## DUNCAN v. UNITED STATES. *
### No. 7162.

Circuit Court of Appeals, Ninth Circuit.
Dec. 13, 1933.

*Rehearing denied February 23, 1934.

United States, but a subject of the Kingdom of Rumania, and was not born in Camden, N. J., but was born in Rumania on the 20th day of April, 1904.

The second count of the indictment charges a violation of 18 USCA § 141, in that the defendant unlawfully, willingly, and knowingly, for the fraudulent purpose of securing a passport of the United States, falsely represented himself to be a citizen of the United States without having been duly admitted to citizenship; that he represented himself to be a citizen of the United States born in Camden, N. J., when as a matter of fact he was not born in Camden, N. J., but was born in the Kingdom of Rumania and was never duly admitted to citizenship.

The third count of the indictment charges the defendant with perjury in violation of 18 USCA § 231 in connection with his application for a passport, in that he falsely swore that he was a citizen of the United States born in Camden, N. J., when as a matter of fact he was not a citizen of the United States and was not born in Camden, N. J., and was not born in the United States. In testifying before the immigration officers January 15, 1931, the appellant gave his name as Basil Duncan Couyanos Renaldo and stated he had used the names Renault Duncan, Basil Couyanos, and Duncan Renaldo (his stage name); that he was born on April 23, 1904, and would be twenty-seven years of age on April 23, 1931; that he entered the United States in September, 1921, on the ship Puget Sound; that he shipped as a seaman thereon out of Dunkerque, France, as a Greek citizen under the name of Basil D. Couyanos. He stated that he was admitted to the United States at that time as an alien seaman at Baltimore, Md.; that during the World War he had lived in Rumania, at Galatz, in the province of Covurlui; that he obtained a passport as a Rumanian citizen when he went from Rumania to France; that he was living in Rumania with some people by the name of Couyanos. He also testified before the Bureau of Investigation of the Department of Labor, as follows:

"Q. These people whom you say you were living with in Rumania, you say they were your father and mother? A. Yes.

"Q. What were their names? A. Father, Demetri Couyanos, and mother Tedora Couyanos, but sometimes instead of calling them mother and father I would call them by name. I have lived with them as far as I can recollect.

"Q. Do you recollect living with any oth-

William T. Kendrick, Jr., and Russell Graham, both of Los Angeles, Cal., for appellant.

Peirson M. Hall, U. S. Atty., of Los Angeles, Cal., and Fred Horowitz, Sp. Asst. to Atty. Gen., for the United States.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

WILBUR, Circuit Judge.

The appellant was convicted on each of three counts of an indictment, all based on representations by the appellant that he is a citizen of the United States, born in Camden, N. J.; whereas, it is alleged that he was born in the Kingdom of Rumania.

The first count charges that the defendant made false statements in an application for a passport, with the intent to secure the issuance of a passport for his use, contrary to the law regulating the issuance of passports (22 USCA § 220) and the regulations of the State Department in reference thereto, by falsely stating that he was a native citizen of the United States and that he was born in Camden, N. J., on April 23, 1904, when in truth and in fact he was not a citizen of the

ers? A. I have a tremendous amount of relatives there but I have always lived with my father and mother in one place.

"Q. Who are your relatives there? A. I have no direct relatives there.

"Q. Do you have any brothers or sisters? A. No, I haven't any direct brothers or sisters. There were four or five in the Couyanos family and I used to call them brothers and sisters although I am not related to them. * * *

"Q. What are the names of some of the children of this Couyanos family in Rumania? A. One is Aggripina, another is Ionel and another is Efeochia; that is all. They have another girl named Sofia.

"Q. What is your mother's maiden name in Rumania? A. His wife is Teodora Couyanos. I do not know her maiden name. That is all I know.

"Q. * * * Have you ever lived in Camden, New Jersey? A. No, I have not."

It appears that as long as appellant remembered he had lived in Rumania in the home of Demetri and Teodora Couyanos, whom he had called father and mother. He had no recollection of any other father and mother, but states that his earliest recollection was crossing a large body of water and that the people he called father and mother with whom he lived had told him he was born in Camden, N. J.; that they stated to him the name of his parents but that he had never seen either of them. Appellant took the witness stand in his own behalf and repeated most of the statements he had made before the immigration authorities above stated.

The records of the ship Puget Sound on which he shipped as a coal passer in 1917 were introduced in evidence and showed that Basil Couyanos was a member of the crew and his signature to the records was introduced in evidence. When the Puget Sound arrived at Baltimore, Md., appellant first entered this country. He applied for admission to the United States as a citizen but withdrew his application and entered as an alien. He was allowed to enter to reship foreign, but he did not reship. He went to New York and remained there. On October 17, 1924, he applied for a marriage license, giving the name Renault Demetri Duncan; place of birth, Rumania; place of father's birth, Rumania; place of mother's birth, Rumania; father's name, Demetri J.; mother's name, Theodore Marienne. On March 29, 1926, he applied for life insurance giving his name as Renault Duncan Couyanos; date of birth, April 23, 1904; and place of birth, Rumania. On De-

cember 14, 1927, he wrote a letter to the Commissioner of Immigration stating that he desired to become naturalized and giving the name of Basil D. Couyanos. On January 14, 1929, just three months before he made his application for passport as an American citizen, he made a written application for life insurance giving his birth place as Rumania and the date of birth April 23, 1904. On December 18, 1930, appellant procured a false affidavit to be made for the purpose of effecting an entry in the record of vital statistics at Camden, N. J., purporting to show that he was born there on April 23, 1904. In that record thus obtained the father's place of birth was given as United States, the mother's as Rumania, name of father, Francis B. Duncan, and name of mother, Marie Mariensco. The witness who made the affidavit on which the registration of birth was entered in the records of Camden, N. J., as of April 23, 1904, testified that the affidavit was made by him without knowledge of the facts at the request of the appellant, who knew the statements in the affidavit as to affiant's acquaintance with appellant, and of affiant's knowledge of the facts sworn to, were untrue. In the register of births in the city of Camden, N. J., the entries were arranged alphabetically and not chronologically. Under the heading "DU" was the entry "Renault Duncan, April 23, 1904," giving place of birth as 217 Federal street, and showing entry by affidavit 12/18/30. There is no other record of birth of Renault Duncan. There was no entry of birth under the name of Couyanos in the Camden, N. J., records that could apply to the appellant.

■ The most serious question presented by the record is the question of the admissibility of a photographic copy of the records of births for the year 1904 in the custody of the mayor of Oancea, district of Covurlui, Kingdom of Rumania, purporting to show that appellant was born there April 20, 1904. This certificate is as follows:

"Mayor Com. Oancea District of Covurlui. Rumania.

"Extract from the register of Vital Statistics for births in the year 1904.

"No. 32 Vasile Dumitru V. Cugheanos.

"In the year one thousand nine hundred and four, month of April, the twentieth day at five o'clock in the afternoon. Certificate of birth of the child Vasile, male sex, of orthodox religion born today at about one o'clock in the afternoon, in the house of his parents of the Commune of Oancea, legitimate son of Mr. Dumitru V. Cugheanos twen-

ty eight years of age, by profession proprietor of a steam mill and of Mrs. Teodora D. V. Cugheanos twenty years of age by profession housewife, both of orthodox religion and domiciled in the Commune of Oancea. In accordance with the declaration of the father who presented the child to me; the witnesses were; Mr. George Dimitriu thirty seven years of age and Constantin Dulgherescu thirty six years of age both of orthodox religion, clerks by profession domiciled in the Commune of Oancea, who have signed this document together with the declarant and with their own signatures after I have first read it to them. Verified according to law by us Iordache T. Onu Mayor of the Commune of Oancea and officer of vital statistics.—

"Declarant (ss) D. Cugheanos
"Witnesses { (ss) Gh. Dimitriu
{ (ss) C. Dulgherescu
"Mayor (ss) I. T. Onu
"Notary (ss) P. I. Tepelus."

Attached to this birth certificate is a certificate of the mayor of Oancea attested by his official seal and by the signature and seal of a notary. This certificate reads as follows:

"Rumania. Townhall of the Commune of Oancea, District of Covurlui. The present photograph is taken from the records of vital statistics for births in the year 1904 under Number 32, and is certified by us.

"Mayor: (ss) T. Ganea
"(Seal) Notary: (ss) I. Vlase
"No. 1463
"November 19, 1932."

The signatures of the mayor and notary are in turn authenticated by the certificate of the prefecture of the district of Covurlui, whose signature, seal, and official position, in turn, were attested by the signature and seal of the Minister of the Interior of Rumania. The signature of the Minister of the Interior of Rumania was certified by the Consul of the United States at Bucharest, who, after certifying to his own official position as Consul of the United States in and for the Kingdom of Rumania, certifies that the person who signed the above-mentioned certificate "was a delegate of the Minister of the Interior of Rumania at the time of so doing and as such competent to certify such authentification," that the signature is the signature of the official in question, and that the official seal attached is that of the Rumanian Minister of the Interior. To this certificate of the Consul is attached a certificate of Henry L. Stimson, Secretary of State of the United States,

by his chief clerk, accompanied by the seal of his office, certifying that the Consul who subscribed the above-mentioned certificate was Consul of the United States at Bucharest, Rumania, duly commissioned at the time of the signing of such certificate, and that full faith and confidence are due to his acts as such. Attached to these documents was a translation thereof by a member of the bar of Ilfov, Bucharest, Rumania, sworn to before the American Consul at Bucharest. In addition thereto, and authenticated in substantially the same manner, is a further certificate of the prefecture of the district of Covurlui, as follows:

"Rumania. Prefecture of the District of Covurlui. Certificate No. 13434. November 21, 1932.

"We, Prefect of the District of Covurlui, pursuant to the petition addressed to this Prefecture and registered under No. 13434/932, by Mr. Rudolph Peltzer, Vice Consul of the United States of America, by which he requests a certificate to the effect that Mr. Traian Ganea functions in the capacity of the Mayor of Oancea of this District as well as that Mr. I. Vlase is Notary of the Commune of Oancea,

"WE CERTIFY: 1. That Mr. Traian Ganea is the present Mayor of the Commune of Oancea and also functions as Officer of Vital Statistics and Custodian of the Registers of Vital Statistics in accordance with Art. 159, Paragraph 8 and Article 536, of the law for the organization of local administration.

"2. Mr. I. Vlase, Notary of the Commune of Oancea, is and functions at present in the capacity of Notary of the Commune of Oancea in this District.

"In view of which the present certificate is issued.

"Prefect: (ss) Illegible. For the Director: (ss) N. Grigoras (Seal)"

Appellant objected to the introduction of these documents on the general ground that there was no proper foundation laid, that it was hearsay, not properly identified, not within the issues alleged in the indictment, incompetent, irrelevant, and immaterial, and that it was not the best evidence. He objected specially on the ground that the proper foundation was not laid because—

"There is no evidence here that the defendant was born on the date [April 20, 1904] of this alleged birth certificate, [he claimed to have been born April 23, 1904] or that he is the party named therein; there is

absolutely no evidence—in fact the evidence is to the contrary, offered here by the government; they have offered the [Camden, New Jersey] birth certificate and statement of the defendant [before the immigration authorities] that these people were not relatives of his; they have offered proof that he was born on April 20th [23d] 1904; * * * there is not the slightest showing that this defendant is the party named in this alleged birth certificate; * * * counsel say this is the defendant's birth certificate; it is not at all; there is absolutely no evidence showing it, and there is evidence to the contrary; there is no such name as this charged in the indictment as this party in this certificate. * * * I believe your Honor will note that on that certificate some man there is mayor of that town, and something else to show that he has charge of those records; if so, I fail to find it. * * *

"I call the court's attention, and I know Mr. Horowitz [Special Assistant to the Attorney General] will be glad to correct me; there is no 'Cugheanos' in here; the Cugheanos is not mentioned in these insurance policies nor anywhere else; this is Cug[h]eneos; it is pronounced Creanos; it isn't even spelled that way."

We think the trial court was justified in the conclusion that Basil Couyanos and Vasile Cugheanos were idem sonas in the Rumanian language. In view of this, coupled with the similarity of the names of the father and mother shown in the birth certificate to the names of the persons with whom the appellant resided in Rumania and whom he called father and mother, respectively, we think the special objection that the birth certificate did not purport to be that of the appellant was properly overruled.

The only other special objection to the method of authentication of documents relates to the mayor of the town and is not sufficiently clear to raise any point.

It is a fundamental rule that objections to the admissibility of evidence must be made in the trial court and must be specific, and that general objections such as those advanced here that the evidence is "incompetent, irrelevant and immaterial and not the best evidence, and no proper foundation laid," are insufficient. See Curtis v. No. American Indian (C. C. A. 9) 277 F. 909. To this latter rule there is an exception sometimes applied on appeal where the evidence offered is not competent for any purpose and the defect is such that it cannot be cured by the proponent. In such a case the admission of the testimony over the general objection of incompetency has sometimes been held to be error. This is merely another way of holding that even if it were admitted in the face of a general objection it could have no probative value because it is so incompetent as to be no evidence at all.

In the assignment of errors appellant is more specific as to his objections to the Rumanian birth certificate. Seven objections to the certification are stated, of which we need mention but three:

First, 1. There is no proof that the laws of Rumania require the keeping of records of birth.

Second, 2. There is no proof that the purported record was kept in accordance with the laws of Rumania.

Third, 7. There is no certificate under the great seal of the Kingdom of Rumania authenticating the signature or the official capacities of any of the persons who signed any of the certificates.

We will discuss now these specific assignments in part because the probative value of foreign or domestic records depends upon the question whether or not such records are required by law to be kept, and this question is involved in the question of their admissibility over the general objection of incompetency made by the appellant. Where such records are required by law to be kept, a presumption arises that they are an accurate record of the facts, and thus they become prima facie proof of the facts required by law to be so recorded. In Stanglein v. State of Ohio, 17 Ohio St. 453, 463, it was held, however, that the record was incompetent in the absence of proof of some law requiring records of marriages to be made and kept. The court said: "No such proof was given, and we are unable to see how we can presume the existence of such laws. And the books are uniform to the effect that it is essential to the official character of any record, and to its competency as evidence, that it has been made and kept by a person whose duty it was to make and keep it. 1 Greenleaf's Ev. § 485. And before an instrument, made in a foreign country, which derives a legal effect and operation from the laws of that country, can be admitted in evidence, the existence of the law itself must be proved. 2 Starkie on Ev. 460; 1 Bishop on Marriage and Divorce, § 478. We are forced to the conclusion, therefore, that there was error in the admission of the Seibeldingen record in evidence, and in the charge of the court to the jury as to its legal effect."

The Supreme Court of Massachusetts, in Re Derinza, 229 Mass. 435, 118 N. E. 942, 946, dealt with papers purporting to be copies of the certificates of marriage of the deceased and the birth of his several children, which were received in evidence. They were apparently certified by the custodian of the records in an Italian town. It was held that these copies of certificates were not competent evidence. The court there stated: "There was no proof of the law of Italy requiring or permitting the keeping of such records by the town, the deposition of the custodian of the records covering material points was not proffered, nor was there any evidence respecting their character, the circumstances under which the records were kept, or the source from which the certificates came. No one testified that they were copies of an official original. There was no authentication of them as genuine by a consular officer of the United States. There was absolutely nothing beyond the bare production of the copies of the certificates. In the absence of a statute making such certificates admissible by themselves, or something to show that they were entitled to a degree of credence, they were not competent. [Citing cases.] It is not necessary to decide just what formalities would have been required to render them competent evidence, as the present record is entirely bald of anything in that direction. An examination of all the cases collected in 26 Cyc. 885, note, and relied on by the arbitration committee and the industrial accident board, as to foreign marriages, shows that in none of them was the marriage certificate admitted without either an express statute admitting the certificate, or evidence of some statute of the foreign state or nation requiring the record to be made, or some evidence showing a legal obligation or established practice to keep the record, or some fact respecting the authenticity of the record of the effect of which the court can take judicial notice. No one of these elements is present in the case at bar. We can have no judicial knowledge respecting records of town officials in Italy."

In Guerra v. San Antonio Sewer Pipe Co. (Tex. Civ. App.) 163 S. W. 669, 671, the certificate of a Mexican officer in charge of certain records, as to the birth of a child without further proof of the existence of the record or of the authority of the officer having custody thereof, was rejected; the court stating: "This instrument was not accompanied by proof of the existence of any law of the republic of Mexico requiring the keeping of such records. There was no proof of the genuineness of the original record by facts and circumstances, or by any person able to testify thereto. The evidence does not disclose who is the proper custodian of such record, and who is authorized to certify to copies thereof. If the law be proved, and the genuineness of the record, an examined copy can be used, or a certified copy, but in the latter case the genuineness of the signature of the officer certifying thereto must be properly authenticated."

It was held that the order of court excluding the record was correct. The portion of this excerpt which is germane to the point under discussion is the statement of the court that the instrument was not accompanied by proof of the existence of a Mexican law requiring the keeping of the records.

In 22 C. J. 854, § 1033, it is said: "Thus, copies of foreign registers of baptism, marriage and death, duly authenticated, have frequently been held to be admissible either under or apart from the statute, although it has also been considered that such transfers, however well authenticated, are not prima facie evidence of the facts recited unless it is made to appear that the laws of the foreign country require such registry to be made and kept, and also under statutes that it must appear not only by the certificate of the custodian, but also by evidence distinct therefrom, that the fact was registered in due form. In the absence of some statutory provisions * * * any evidence is not generally sufficient that ultimately tends to prove that the document offered is in fact certified by the official custodian of the original of which it purports to be a copy and that he has due authority to make such certification."

In State v. Dooris, 40 Conn. 145, a document was offered purporting to be a copy of an entry in "the 'Marriage Register Book' in the office of the superintendent registrar of births, marriages and deaths for the district of M. in Ireland." It was held that the document was inadmissible because it did not appear that the keeping of such book was required by law. The court in that regard stated: "But it does not appear in the case that the law of Ireland required the registration of marriages." To the same effect is the decision in Tucker v. People, 117 Ill. 88, 7 N. E. 51; Nagle v. Dong Ming (C. C. A. 9) 26 F.(2d) 438. We have found no case to the contrary.

 It is essential therefore in order that the record introduced in evidence shall have any probative value that it shall be kept in compliance with and conformity to the law of

the nation, state, or district in which it is kept. Consequently, in order that such a record should be admitted in evidence it should be proved that the record was kept in compliance with the local law. The order of proof is not important. Preferably the proof of the foreign law should accompany the authenticated copy of the record and be made by certificate. The law could undoubtedly be proved in other ways. In the case at bar the facts stated in the various certificates come close to, but still fall short of, evidence that the record of vital statistics kept at Oancea, Rumania, was kept in compliance with the local law. There are two statements and documents presented which tend strongly to that conclusion, but still fall short of the requisite proof. The first is the record itself to the effect that "it is verified in accordance with law." Taken literally this applies only to the method of authentication of the record and not to the fact that the law requires a record to be kept. In addition thereto, we have the certificate of the prefecture to the effect that the mayor who signed the certified copies is custodian of the registers of vital statistics from which the photographic record is taken, and to the effect that he is the custodian thereof "in accordance with Art. 159, Paragraph 8, and Article 536, of the law for the organization of local administration." This clearly indicates that he is the proper officer to make the certificate, but it still falls short of the requirement that it should appear that the record was made at the time it purported to be made, in conformity with the law then in force. There are a multitude of books and documents in the custody of public officials, as such, which were not made in conformity with the law and which have no probative value of the facts stated therein. Inasmuch as no special objection was made to the certificates on the ground that there was no certificate or other proof to the effect that the record in question was required by the law of Rumania to be kept at the time it purported to have been made, and that such an objection if made could have been overcome by proof of such a law, the general objections made were properly overruled, and the more specific assignment of this ruling as error cannot be sustained.

There is, however, another aspect of this question which we must now consider. The appellant, at the conclusion of the evidence, moved for a directed verdict and assigns as error the refusal to grant the motion. Appellant argues that: "Aside from the purported birth certificate * * * the record is wholly void of any evidence whatever to prove the most essential part of the corpus delicti, viz., the falsity of his alleged statements, except his extra-judicial statements and admissions."

Before directing our attention to this contention, we should state that the appellant's principal argument upon the alleged error in denying his motion for instructed verdict is based on the proposition that there is no competent evidence that the appellant made the affidavit or the representations alleged in the indictment. This is predicated on the testimony of the appellant that at the time he signed the affidavit which was filed with the Secretary of State for the purpose of securing a passport, the blanks in the printed affidavit were not filled in and the alleged false statements as to his age and birth place were subsequently inserted therein without his knowledge or consent. It is true that he contended then, as he does now, that he was born in Camden, N. J., and he contended then, as he does now, that he was a citizen of the United States and that he intended to apply as such for such passport, yet it is claimed by him that he did not make the aforementioned representations or affidavit. It is sufficient to say that the jurat of the clerk of the District Court of the United States for the Southern District of California to the oath is sufficient prima facie proof that the affidavit was made in the form in which it is now presented in court.

We turn now to the contention that without the certificate the evidence was insufficient to justify a verdict of guilty, and that a motion of the defendant for instructed verdict of not guilty should have been given. Appellant argues that all these proofs as to appellant's Rumanian birth and alien citizenship are based on statements and admissions of the defendant, and, therefore, have no higher probative value than the statements and admissions by the appellant, and that such statements and admissions are insufficient to prove the corpus delicti. There can be no doubt of this fundamental rule relied on by appellant. In that view of the case, the fact that the appellant procured false affidavits for the purpose of substantiating his claim that he was born in Camden, N. J., would amount to nothing more than proof of his belief that he was born in Rumania, and would have no higher probative value than a confession or an admission that he was born in Rumania; such admissions are abundant in the record. Appellee claims that the fact that the defendant entered the United States as an alien from a vessel on which he had

shipped in a foreign port as an alien is independent evidence of alienage and consequently sufficient to support the verdict of the jury. In this connection it should be observed that shipping as an alien on board an alien ship was necessarily predicated on belief of the defendant that he was such an alien and is in effect nothing more nor less than an admission on his part of alienage. The same is true of his application for naturalization. It is shown, however, that there was no record of the birth of Basel Couyanos or Vasile Couyanos in the official records of births in Camden, N. J., and no record of birth of Renault Duncan other than the one entered in 1930 on the false affidavit procured by the appellant for that purpose.

■ Appellant represented in his sworn application for passport that he was born in Camden, N. J. This was a material fact, for if he was born in Camden, N. J., he was a citizen of the United States. It was not necessary to prove that he was born in a foreign country to prove that perjury had been committed. We think there was sufficient evidence of the corpus delicti on the charge of perjury to justify the introduction of the admissions and statements of the appellant and that the evidence of perjury is amply sufficient to support the verdict without reference to the Rumanian birth certificate.

■ With reference to the first count charging the defendant with making false statements in his application for passport, the allegation and proof that he stated that he was born in Camden, N. J., on April 23, 1904, coupled with the proof that the records of Camden, N. J., showed no birth of the appellant other than by the false record caused to be inserted therein by the appellant, was sufficient proof of the falsity of a material statement.

■ With reference to the second count, the charge is that the appellant falsely represented himself to be a citizen of the United States without having been duly admitted to citizenship, etc., in violation of 18 USCA § 141. In order to establish this charge it is not only necessary for the prosecution to show that the appellant was not born in Camden, N. J., but also to show that he was not a citizen of the United States. There is no

evidence to establish that fact other than the admissions of the appellant as hereinbefore stated. These were insufficient to prove the corpus delicti.

What we have said disposes of all the points raised by the appellant other than the one that the verdict in the case was in legal effect an acquittal of the appellant. There is nothing in this point. We merely mention it to show it has not been overlooked.

■ It follows that the judgment on the first and third counts must be affirmed, and that on the second count must be reversed. It should be here stated that the sentences on the first and third counts run concurrently. The first count is for a violation of 22 USCA § 220, the third count is for a violation of 18 USCA § 231, and the second count is for a violation of 18 USCA § 141. In view of the reversal of the judgment and sentence on the second count, it is proper to notice the fact that the appellant claims that this count does not state an offense. The point is made that although the indictment charges that the appellant "did falsely represent himself to be a citizen of the United States without having been duly admitted to citizenship," it did not specifically allege that he was not a citizen of the United States. It is specifically alleged, however, that he falsely represented himself to be "a citizen of the United States, born in Camden, New Jersey, on April 23, 1904, when in truth and in fact, as the defendant well knew, he was never duly admitted to citizenship of the United States and was not born in Camden, New Jersey, but was born in the Kingdom of Rumania, on the 20th day of April, 1904." It is claimed that this latter allegation is insufficient for the reason that although it is alleged that the appellant was born in the Kingdom of Rumania he might nevertheless be a citizen of the United States (8 USCA § 6), but the allegation in the language of the statute that the defendant "did falsely represent himself to be a citizen of the United States without having been duly admitted to citizenship" is a sufficient allegation without an affirmative allegation that he was not a citizen of the United States.

Judgment affirmed as to first and third counts, and remanded for a new trial as to the second count.