Benjamin DRANOW, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 16894, 17010.

United States Court of Appeals Eighth Circuit.

Sept. 10, 1962.

Rehearing Denied in No. 16,894 Oct. 5, 1962.

548

Bert B. Rand of Trammell, Rand & Nathan, Washington, D. C., for appellant; Hans A. Nathan and Warren E. Magee, Washington, D. C., Frank J. Collins, Minneapolis, Minn., on the brief.

William W. Essling, Sp. Asst. to Atty. Gen., St. Paul, Minn., for appellee; James F. Neal, Sp. Asst. to Atty. Gen., Washington, D. C., Thomas Malone, Sp. Asst. to Atty. Gen., St. Paul, Minn., and Miles W. Lord, U. S. Atty., Minneapolis, Minn., on the brief.

Before SANBORN, BLACKMUN and RIDGE, Circuit Judges.

RIDGE, Circuit Judge.

After a six week trial the defendant, Benjamin Dranow, was convicted by jury verdict on eighteen (18) counts of a twenty-one (21) count indictment severally charging mail fraud in violation of 18 U.S.C.A. § 1341; fraud by wire in violation of 18 U.S.C.A. § 1343; and bankruptcy offenses in violation of 18 U.S. C.A. § 152. The jury found Dranow not guilty on counts Ten, Seventeen and Nineteen of the indictment, charging separate bankruptcy offenses. On the guilty verdicts Dranow was sentenced as follows: On counts One through Nine of the indictment (mail and wire fraud) a general sentence of five years' imprisonment and a committed fine of $5,-000.00 was imposed. On counts Eleven through Sixteen and count Eighteen of the indictment (transfers made in cor

templation of bankruptcy) a general sentence of five years' imprisonment and a committed fine of $5,000.00 was assessed, the penal portion thereof to be served concurrently and not consecutively to the general penal sentence imposed on counts One through Nine.[1] A general sentence of two years' imprisonment and a committed fine of $2,000.00 was imposed on counts Twenty and Twenty-One (false entries made in documents affecting and relating to the property and affairs of the bankrupt) to be served consecutively to the two five-year concurrent general sentences.[2] At the imposition of sentences the District Court also adjudged that the "defendant * * * shall pay the costs of the prosecution," the amount thereof to be determined by the District Court. In Case No. 16,894, Dranow prosecutes his appeal from the above judgments of conviction and general sentences.

In Case No. 17,010, Dranow prosecutes an appeal from an order of his trial court denying a motion, filed under Rule 33, F.R.Cr.P., 18 U.S.C.A., for a new trial of the charges on which he was convicted as above, premised on the ground of newly-discovered evidence. A footnote to defendant's brief in Case No. 16,894 is as follows:

"On February 9, 1962, appellant filed a Motion for a New Trial, predicated upon newly discovered evidence. On February 14, 1962, the Trial Court indicated its unwillingness to indicate to this Court that the Motion be granted as a basis for a Motion to Remand. (Rule 33, F.R. Cr.P.) A timely Notice of Appeal was filed on February 19, 1962, and the Clerk of this Court has notified appellant that this related appeal (No. 17,010) will be heard by the Court at the same time as this appeal from the judgment of conviction."

1. The maximum penalty for violation of Secs. 1341 and 1343, T. 18 U.S.C.A. is not more than 5 years' imprisonment or $1,000.00, or both.

2. The maximum penalty for violation of Sec. 152, T. 18 U.S.C.A. is not more than 5 years' imprisonment or $5,000.00, or both.

All that has been lodged with this Court in Case No. 17,010 is the original records of the District Court containing pleadings, exhibits and briefs filed before the District Court. Notwithstanding the docketing of the appeal in No. 17,010 and setting thereof for argument, neither party has filed briefs in this Court in regard to that appeal as provided in our Rule 11, 28 U.S.C.A. No request has been made for leave to perfect that appeal out of time. Because it is apparent appellant in Case No. 17,010 is in default for failure to perfect that appeal as provided in Rule 11, supra, that appeal is dismissed.[3]

At the outset of our consideration of the appeal in Case No. 16,894, we are faced with a most disagreeable task— that of being reproachful of the manner in which this appeal is presented to us. "It is not pleasant to be compelled to remind counsel that language used in briefs, as well as that employed in oral argument, must be respectful," (Kneeland v. American Loan and Trust Company et al., 138 U.S. 509, 513, 11 S.Ct. 426, 428, 34 L.Ed. 1052, 1054) and that scandalous matter must be avoided at all times in this Court. However, "it is our duty to keep our records clean and free from scandal." Green v. Elbert, 137 U.S. 615, 624, 11 S.Ct. 188, 191, 34 L.Ed. 792, 796. And, as Judge Walter H. Sanborn of this Court said many years ago, in Kelley v. Boettcher, 10 Cir., 85 F. 55, 57 (1898): "The authority and the duty of a federal court to keep its records free from stain and scandal are by no means dependent on the ability or disposition of counsel * * * its power is plenary, and its duty imperative * * *." In the light of the too numerous decisions of this and other Courts of Appeals, it should not be necessary for us to repeat,

"A brief should not contain language disrespectful to the court nor to opposing counsel and ordinarily a brief containing such scurrilous and scandalous matter should be stricken from the files." Anderson v. Federal Cartridge Corp., 156 F.2d 681, 686 (8 Cir. 1946).

In the case at bar we regret to find in the very first paragraph of appellant's "Statement of the Case" and at numerous places thereafter in both his principal and reply briefs, aspersions cast not only on the conduct of the eminent, seasoned District Judge who presided at the trial of the case at bar but also on opposing counsel which are wholly uncalled-for, unwarranted and not justified by the record before us. The printed statement and argument in appellant's briefs abound in unwarranted criticism, vituperation, calumny, and derogatory, impertinent and scandalous expression directed at both the Trial Judge and opposing counsel.[4] We shall not give herald to any such matter by quoting the same. It is sufficient for us to say that we cannot, having the regard and respect we have for all members of the judiciary, and that which we entertain for all members of the bar, permit such scandal to pass unrebuked.

If this were not an appeal from a criminal conviction we would not hesitate to order the briefs filed by appellant stricken from the files of this Court in their entirety and order new briefs to be filed. But we are not disposed to further delay the disposition of this appeal since it has previously been twice continued in this Court at the request of appellant. Mindful as we are of our duty in a criminal appeal, where life and liberty of an appellant is involved, that we must satisfy ourselves that his trial and

---

3. Rule 11(e) of this Court provides: "Effect of Default. When according to this rule an appellant in a criminal case is in default, his appeal may be summarily dismissed * * *."

4. In the light of the statements directed at the Hon. Gunnar H. Nordbye, it should be here noted that on the day the jury returned their verdicts Dranow said:

"Thank you very much for a good trial"; and prior to the time sentence was imposed, Dranow in open court again thanked Judge Nordbye for his "tremendous patience" and for the "wonderful way" he was "able to keep (his) temper" during the trial when seemingly some of counsel became impatient and momentarily lost their tempers.

**550**

conviction have not been jaundiced by illegality or prejudice in any form and that his conviction has not resulted in a miscarriage of justice, we shall proceed to consider this appeal on its merits. However, it is to be understood that all calumnious, defamatory, disrespectful, derogatory, impertinent and scandalous matter contained in appellant's briefs directed toward or denunciatory of the Trial Judge or Counsel for the Government is hereby ordered stricken therefrom and no such matter, directly or indirectly, shall hereafter be considered a part of the records of this Court.

In our consideration of this appeal we find it difficult to make a chronological, detailed statement of facts that will demonstrate all the issues which we are called upon to decide. The difficulty arises not because of the matter stricken from appellant's brief as above but for the reason the record herein contains close to six thousand pages and appellant's principal brief has been prepared in disregard of Rule 11 of this Court.[5] Appellant's brief does not contain a "concise statement of the case";—it is argumentative, editorialized, redundant, and interlaced with overlapping factual matter. Some factual matter stated is not supported by reference to the pages of the record where the same may be found, and some such are manifest distortion of facts and excursions outside the record. Then, too, the printed argument does not follow the "Points and Authorities" (sixteen in number)[6] in form, manner or style as stated, and some points are totally abandoned in the written argu-

---

5. Rule 11 of this Court provides in part:
"(b) Contents of Brief. A brief shall contain, in the following order:
\* \* \* \* \*
"Third.—A concise statement of the case in so far as is necessary for the court to understand and decide the points to be argued \* \* \*, giving the pages of the [typewritten] record [in a criminal case] where each fact can be found and verified. If a point relates to the admission or exclusion of evidence, the statement shall quote the evidence referred to, and any objections or other equivalent action taken relative thereto, together with the rulings of the court thereon, giving the pages of the printed record on which the quotations appear. \* \* \* If a point relied upon relates to the giving of instructions or the refusal to give instructions requested, the statement shall quote the portions of the instructions or of the requested instructions which are referred to, the objections or exceptions taken to the giving of the instructions or to the refusal to give requested instructions and the rulings of the court thereon, and shall give the pages of the printed record on which the quotations appear. \* \* \*
"Fourth.—A concise statement of each point to be argued, with a complete list of all cases and statutes referred to in the argument covering the point \* \* \*.
"Fifth.—A printed argument which shall substantially follow the order of points stated under paragraph 'Fourth'. The court will disregard any statement in the argument as to what the record con-tains unless reference is made to the page of the record printed record where the statement may be found or verified.
\* \* \* \* \*
"(c) Length of Briefs. The appellant's or petitioner's brief shall not exceed 85 [printed] pages \* \* \*."
(Appellant's main brief is 156 pages in length; with an appendix of 195 additional pages.)

6. Tersely stated, the "Points and Authorities" are that the District Court erred: (1) denying defendant's motion for severance; (2) his motion to "dismiss on the grounds of res judicata and/or collateral estoppel"; (3) to dismiss counts 1 through 9 of the indictment for failure to charge an offense; (4) counts 10 through 21, on the ground that only a single crime is alleged therein; (5) motion to strike surplusage and dismiss the indictment because duplicitous; (6) motion to transfer to another district for trial; (7) denying defendant's several motions for mistrial; (8) abuse discretion in admitting evidence; (9) trial judge's unwarranted participation in trial; (10) in refusing to compel prosecution to *produce documents*; (11) deny requested instructions in form as proffered; (12) charge to jury was tantamount to directed verdict of guilty; (13) as to form of verdict; (14) verdict not supported by evidence; (15) imposition of unusually severe sentence; and (16) failure to sustain motion *non obstante veredicto*, and alternatively for a new trial.

ment.[7] As a consequence, we find ourselves relegated to the titles and subtitle headings which appellant has given to his written argument to get some conception of what he intends to present to us by this appeal. Having in mind the provisions of Rule 52(b), F.R.Cr.P., 18 U.S. C.A., which permits appellate courts to recognize plain errors, we accept the titles given to appellant's argument as the Assignments of Error proffered to us in this appeal. In so doing we shall first make a terse statement of the charges contained in the indictment, and thereafter the general facts established applicable to all counts thereof, considered in the light most favorable to the verdicts of the jury as returned. Thereafter, additional facts which will expose the issues raised and the law applicable to each such proposition will be stated in the course of our consideration thereof.

In our review of the case at bar we are mindful of the rule stated in Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943); Masinia v. United States, 296 F.2d 871, 880 (8 Cir. 1961); and many other cases, that where a defendant is convicted on several counts of an indictment and general penal sentences are ordered to run concurrently it is not necessary on review to consider the validity of the sentences on all counts, if the sentence on one is sustainable. Although we recognize that principle of judicial review is not entirely applicable here, since the District Court imposed a single committed fine on counts One through Nine; and a like committed fine on counts Eleven through Sixteen and in Eighteen, both of which fines are in excess of the maximum that could be assessed on any one count for violation of either Section 1341 or 1343, supra; and made the sentence and fines on counts Twenty and Twenty-One to run consecutively thereto,—nevertheless, in light of the charges made in the instant indictment and the concurrent penal sentences imposed, our labors may be somewhat lessened by keeping the above principles in mind. This, because much of the proof as made in the District Court as to the mail fraud counts may be generally considered applicable to all such counts and that made in respect to the bankruptcy offenses generally applicable to all those counts. Cf. Herman v. United States, 289 F.2d 362, 369 (5 Cir. 1961); Cravens v. United States, 62 F.2d 261, 282 (8 Cir. 1932).

## THE INDICTMENT

The indictment in the case at bar stripped of superfluous verbiage charged: Benjamin Dranow, commencing in the year 1952 and until on or about January 31, 1958, was associated in varying capacities with John W. Thomas Company, a Minneapolis-based department store, and its subsidiaries. From on or about February 1, 1952 and continuing up to the date of the indictment, Dranow devised a scheme and artifice to defraud by means of false representations and promises. It was charged that as a part of said scheme between the years 1953 and 1955 Dranow caused the John W. Thomas Company and its subsidiaries to purchase goods, etc. on credit and to obtain extensions of credit from factors, manufacturers and others who could be induced to extend credit to John W. Thomas Company and its subsidiaries; and in so doing he knowingly caused the true financial condition of John W. Thomas Company and its subsidiaries to be misrepresented to such factors, manufacturers, wholesalers, and jobbers, in that he prepared and caused to be prepared false and fictitious vouchers, invoices and memoranda, etc. which were entered in the books and records of the John W. Thomas Company and its subsidiaries. It was further charged that in 1956 he caused to be prepared and delivered a false, fraudulent and untrue financial statement of the John W. Thomas Company to a credit association which he knew would be used to secure

---

7. Ordinarily, assignments of error not covered by written argument are considered abandoned by this Court. Cf. Hoyer v. United States, 223 F.2d 134 (8 Cir. 1955).

credit and to deter creditors from taking action to collect their debts as they matured against the John W. Thomas Company and its subsidiaries. The indictment further charged: Sometime after June 30, 1956 and before February 4, 1957, Dranow willfully, knowingly and fraudulently did prepare and cause to be prepared a false, fraudulent and untrue consolidated balance sheet of John W. Thomas Company and its subsidiaries dated June 30, 1956, which was false, fraudulent and untrue in the following particulars:

"(i) The balance sheet item, 'Merchandise Inventory * * * $862,-097.40' under the classification of 'Current Assets' included about $450,610.44 * * * which were not Current Assets or Merchandise Inventory and which were either fictitious or worthless as assets.

"(ii) A true liability item of about $184,991.56, * * * due from John W. Thomas Company to United Garment Manufacturing Company was not included with the liabilities; instead, was deducted from the balance sheet item of Merchandise Inventory as carried on the regular books and records of John W. Thomas Company.

"(iii) A true liability item of about $93,561.61 of Amounts Due Leased Departments from the John W. Thomas Company was not included with the liabilities * * *; instead, was deducted from the balance sheet item of Accounts Receivable. * * *

"(iv) The balance sheet item, 'Furniture, Fixtures and Equipment * * * $638,839.10' overstated the true value and the book value of the furniture, fixtures and equipment of John W. Thomas Company and its subsidiaries, by about $360,970.10.

"(v) The balance sheet item, 'Capital Stock and Surplus * * * $2,496,819.76' overstated the true value and the book value of the capital stock and surplus of John W. Thomas Company and its subsidiaries by at least $360,970.10."

and as a part of the said scheme and artifice to defraud, Dranow willfully caused the June 30, 1956 consolidated balance sheet of John W. Thomas Company and its subsidiaries, containing the untrue recitals set out above, to be delivered to Credit Exchange, Inc., 461 8th Avenue, New York 1, N. Y., for the purpose of misrepresenting the true financial condition of John W. Thomas Company and its subsidiaries. Thereafter, on or about February 7, 1957, he demanded that the Credit Exchange, Inc. return that consolidated balance sheet to the John W. Thomas Company; and after it was returned Dranow fraudulently did cause about $254,060.00 of fictitious assets and about $245,043.00 of other worthless assets entered in the books of the John W. Thomas Company and its subsidiaries to be included in a consolidated balance sheet dated June 30, 1957 as part of the item, "Accounts and Notes Receivable" * * * carried under the heading, "Current Assets" appearing in that balance sheet; that he willfully caused the June 30, 1957 consolidated balance sheet of John W. Thomas Company and its subsidiaries containing such false and untrue recitals to be delivered to certain named credit associations and the members thereof to induce them to extend credit to and to sell and furnish merchandise and services on credit to John W. Thomas Company and its subsidiaries so that on or about January 31, 1958 the John W. Thomas Company and its subsidiaries were indebted to said persons in the amount of about $984,-434.93 at a time when the John W. Thomas Company and its subsidiaries were not possessed of sufficient moneys or assets to pay said debts as they matured.

In the concluding paragraph of count One it was specifically charged that Dranow, on August 8, 1957, for the purpose of executing the said scheme to defraud, did * * * "willfully and knowingly * * * cause to be placed in an authorized depository for mail a letter

addressed to Credit Exchange, Inc., 461 8th Avenue, New York 1, N. Y., containing the above-described June 30, 1957 consolidated balance sheet of John W. Thomas Company and its subsidiaries to be sent and delivered by the Post Office * * * in violation of 18 U.S.C.A., Sections 1341 and 2."

Count Two of the indictment alleged that on August 7, 1957, for the purpose of executing the scheme · to defraud, Dranow "transmitted a telephone communication in interstate commerce with one A. Hermeling of the Elder Manufacturing Company of St. Louis, Missouri," in violation of Section 1342, Title 18 U.S. C.A.

Count Three alleged that on August 8, 1957, Dranow caused a letter and the false balance sheet of June 30, 1957 to be sent to Elder Manufacturing Company, St. Louis, Missouri, in violation of Section 1341, Title 18 U.S.C.A. Counts Four through Nine charged similar use of the mails and the sending of that same false balance sheet to six (6) other creditors or proposed creditors of the Thomas Company individually named in each such count.

Count Ten of the indictment charged that Dranow, while an agent and officer of the John W. Thomas Company * * in contemplation of bankruptcy proceedings by that corporation * * * with intent to defeat the bankruptcy law, knowingly and fraudulently transferred and caused to be transferred on January 31, 1958, Five Thousand Dollars ($5,-000.00) in money of that corporation in violation of Sections 2, 151 and 152, Title 18 U.S.C.A. Counts Eleven through Eighteen contained similar charges as above but on different dates and "transfers" of money ranging from $500.00 to $10,000.00.

Count Nineteen charged that on January 31, 1958 the John W. Thomas Company filed a petition in bankruptcy for an "arrangement" under Chapter 11 of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq., and that Dranow in contemplation of the filing of such proceeding made and caused to be made a false entry in the petty cash voucher of the John W. Thomas Company to the effect that the sum of $5,000.00 was a proper expense of that Company as being withdrawn for legal expense whereas, in truth and in fact, Dranow knew that such entry was false, such acts being in violation of Sections 151 and 152, Title 18, U.S.C.A. Counts Twenty and Twenty-One charged similar offenses in respect to other false entries made in the books of the John W. Thomas Company on January 28, 1958 and December 17, 1957.

## FACTS

Substantial competent evidence was adduced by the Government at the trial of the case at bar which established beyond a reasonable doubt that the June 30, 1957 consolidated balance sheet referred to in the indictment was false and fraudulent as alleged and that copies thereof were sent through the mails on August 8, 1957 to the credit agencies, manufacturers, wholesalers, and factors, as charged in Counts One and Three through Nine thereof. The evidence adduced as to Count Two of the indictment was just as conclusive that Dranow had a telephone conversation in interstate communication with one A. Hermeling of the Elder Manufacturing Company in St. Louis, Missouri, on August 7, 1957, relating to that same false consolidated balance sheet.

It should be here noted that although Dranow contends the evidence adduced at his trial "failed to establish his guilt" on the mail fraud charges, he does not, as that assignment is presented to us, contest the competency and sufficiency of the proof as made by the Government to establish the above-stated matter. As will hereinafter appear, his contention as to the sufficiency of the evidence to establish his guilt on counts One through Ten, supra, is premised in this proposition, generally stated: * * * the "prosecution elected to charge a broad scheme" to defraud "commencing in February 1952 and continuing through January 13, 1962" premised in the "idea that Dranow ran the Thomas Company" during that

period of time and Dranow "had something to do with the keeping of the books of the Thomas Company" and directed the preparations of the false June 30, 1957 consolidated balance sheet and caused it to be sent through the mail. It is only by arguing from a premise that defensive evidence adduced at the trial established that Dranow had nothing to do with the managerial office of the Thomas Company prior to June 20, 1956 and that he never was in charge of the books of that Company and had nothing to do with the preparation of the balance sheet of June 30, 1957 or having caused it to be sent through the mails; * * * hence there was no proof of any broad scheme to defraud * * * that Dranow makes the assertion the evidence was insufficient to establish his guilt on the above-mentioned mail fraud counts. That such is not a vista from which we can or should view the evidence in the record before us, in light of the verdicts of guilty returned on counts One through Ten, is clear.

The evidence adduced by the Government established that in the year 1952 Benjamin Dranow became associated with the John W. Thomas Company in the capacity of a concessionaire or fur purchasing agent. Shortly thereafter he became manager of that Company's fur operations. Thereafter, in 1954, he became one of the voting trustees of the common stock of the Thomas Company and was elected to the Board of Directors. In 1955 he was made General Merchandise Manager and Assistant General Manager. In 1956 he acquired all the capital stock of the John W. Thomas Company and became its General Manager and Chairman of its Board of Directors. He continued in that capacity until January 1958 when the John W. Thomas Company commenced a proceeding in bankruptcy seeking an "arrangement" with its creditors.

There was competent evidence establishing that in 1952, 1953 and 1954, during the time Dranow was Manager of the Fur Department of the Thomas Com-

pany, he caused fictitious, fraudulent merchandise inventories and false accounts receivable totaling around $449,-000.00, some purporting to be due from him, to be entered in the records of the Thomas Company. There is evidence to the effect that such dealings were mere paper transactions and in an attempt to cover up the same Dranow caused spurious promissory notes to be executed by one Teddy Held, Abe Weinblatt, Sam Peltz, and by Dranow Furs, Inc., payable to John W. Thomas Company, which notes were thereafter recorded as assets in the books of the Thomas Company as "Notes and Accounts Receivable." Although the original acts of fraud in relation to such notes occurred in 1952 through 1955, there was uncontradicted evidence that such items were reflected in the balance sheet of June 30, 1957 and remained on the books of the Thomas Company until the year 1958. This, notwithstanding the fact that when Dranow purchased all of the stock of the John W. Thomas Company in 1956 he entered into a written agreement with one Louis Yallomstein, then owner of such stock, wherein it was stated in part: "By reason of the fact that there is no likelihood of the Company being able to realize anything on said assets, they should not be included in the January 31, 1956 balance sheet of the Thomas Company."

Meticulous proof of facts made by the Government traced the various transactions going to make up the above-mentioned $449,000.00 into the books and records of the Thomas Company. Succintly stated without intendment to be all-inclusive, such proof established that Dranow while in charge of the Fur Department of the Thomas Company induced employees therein to prepare false invoices for furs that were never received and had them prepare what is referred to in the evidence as "Absence of Bills" which he initialed so that they passed through the Accounting Department for credit to his account in the books of that Company. Such "Absence of Bills" generally related to pretended purchase of

furs. Those and other similar transactions induced by Dranow and accruing in 1952, 1953 and 1954, led to a false inventory in the Fur Department of the Thomas Company amounting to around $400,000.00. To account for that false inventory, Dranow caused pretended sales to be made to Dranow Fur Company, to Teddy Held, to Abe Weinblatt, and also to Sam Peltz. False documents relating to such pretended sales patently appear in the record of the case at bar. It was clearly established that when payment for such pretended sales was not forthcoming, Dranow, to further cover them up, executed a promissory note on behalf of Ben Dranow Furs for a part thereof and induced Held, Weinblatt and Peltz to execute promissory notes in blank, as an accommodation to him, for other parts of such transactions. Several thousand pages of the record before us contains competent evidence relating to Dranow's fraudulent dealings with the Thomas Company respecting the above matter in the years 1953 through 1955.

There was evidence to the effect that Dranow caused the false balance sheet of June 30, 1957 to be prepared by employees of the John W. Thomas Company; that Dranow caused that balance sheet to be enclosed with a covering letter which he personally signed, to be mailed to various wholesale jobbers, to suppliers and to credit agencies. It was established by competent evidence that at the time of the mailing thereof Dranow knew that the John W. Thomas Company had requests from credit agencies, wholesalers and others for a recent balance sheet of the financial condition of the Thomas Company, and that he knew if a current balance sheet was made available to those parties they could and would be induced to use information contained therein to determine whether credit to the Thomas Company should be extended or recommended.

There was other evidence to the effect that at the time the June 30, 1957 consolidated balance sheet was caused to be prepared by Dranow, around $400,000.00 of other accounts receivable of the Thomas Company than those above mentioned were pledged to a Minneapolis bank to secure a loan. Nevertheless, the last-mentioned sum was also included as an item of current "Accounts and Notes Receivable," totaling $1,022,691.57, but the balance sheet did not reflect the fact the last-above-mentioned accounts receivable were pledged as above stated. To that extent the balance sheet of June 30, 1957, under "Current Assets" was also false and fictitious.

From the foregoing, though admittedly not comprehensive of all facts established by the Government, it clearly appears there was ample competent evidence adduced from which the jury could find, as it did, beyond a reasonable doubt that Dranow well knew that the June 30, 1957 consolidated balance sheet was false and that he willfully caused the same to be sent through the mails with the intent to delude and defraud as charged in Counts One through Nine of the indictment.

As to counts Ten through Twenty of the indictment relating to bankruptcy fraud, there is no dispute in the evidence that in 1957 the financial condition of the John W. Thomas Company was desperate. It could not meet its obligations as they matured. It is admitted that when Dranow took over the Company in 1956 it was in bad financial shape which gradually grew worse so that an "arrangement" proceeding in bankruptcy became necessary and such an action was instituted in January 1958. It was admitted by Counsel for Dranow at the trial that within four (4) months of bankruptcy Dranow "did, and there is no question about it, make some withdrawals * * * in the amount of 18 or $20,000.00." The actual amount of withdrawals as proved by the Government, was $22,500.00. There was evidence to the effect that cash and checks amounting to that sum withdrawn by Dranow were not accounted for in the books and records of the John W. Thomas Company other than as having been withdrawn by Dranow. All such withdrawals were traced into Dranow's personal bank accounts. There

was other evidence, however, that $6,-000.00 of the amount Dranow withdrew was used by him to pay for professional services and attorneys' fees and the jury apparently believed that to be true, as they returned a verdict of not guilty on counts Ten, Seventeen and Nineteen of the indictment, which counts were related to the total sum last mentioned. As to the other sums withdrawn, there was competent evidence from which the jury could, as they did, believe that Dranow withdrew the same fraudulently and used the amounts thereof for his own personal financial aggrandizement.

As to counts Twenty and Twenty-One, which relate to false entries made in the books of the John W. Thomas Company, they appear as false entries made to cover up items referred to in counts Eleven and Thirteen of the indictment.

With the foregoing general facts in mind, we proceed to consider the first main title appearing in appellant's printed argument, namely:

"A. THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRE-TRIAL MOTIONS.

(a) The prosecution of appellant was barred by the doctrine of res judicata and collateral estoppel."

Appellant's argument under the above assignment is, that "all the acts and actions, commissions and omissions" charged in all counts of the indictment in the case at bar and proof made thereunder relate to and cover the "same period of time and the same subject matter" as was litigated "In the Matter of John W. Thomas Company, Debtor," the "arrangement" proceeding in bankruptcy commenced by that Company on January 31, 1958. As a consequence, Dranow asserts that the Judgment of Confirmation entered in that bankruptcy proceeding on May 10, 1959 was and is a "final judgment based on a thorough, litigated and adversary examination of the financial condition of the John W. Thomas Company" bankrupt, which included an examination into "all acts and conduct of the defendant for the very time at issue

in the case at bar." Hence he asserts that the litigated factual issues in the above-mentioned bankruptcy case and the issues in this criminal case are identical; that the court below, being the same court that entered the order of confirmation in the bankruptcy proceeding, "had to and did find" in the bankruptcy proceeding "that defendant did not commit any of the acts of commission or omission which are charged in the indictment as crimnial offenses before a final order could be entered in that "arrangement" proceeding. From that premise it is argued "that the very factual issue which the Government alleged and proved in the case at bar "was clearly determined in defendant's favor in the prior bankruptcy proceeding, therefore, it is asserted, the court below erred in denying his pre-trial motion to dismiss the indictment" on the grounds of res judicata and collateral estoppel.

In support of the foregoing, Dranow relies on Caterpillar Tractor Company v. International Harvester Co., 120 F.2d 82, 139 A.L.R. 1 (3 Cir. 1941); National Farmers Union Property & Casualty Co. v. Fisher, 284 F.2d 421 (8 Cir. 1960); and Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). For reasons that will hereinafter appear, we think the doctrine of res judicata and collateral estoppel, as considered in the above authority, is of no help to defendant.

■ There can be no doubt about the proposition that res judicata and collateral estoppel are applicable in a criminal action although a prior proceeding was civil in character. But that proposition has this qualification: that both actions are based upon the same facts and both have as their object, "punishment". Where the object of the prior civil action and subsequent criminal action is not "punishment", res judicata is inapplicable. Cf. Helvering v. Mitchell, 303 U.S. 391, 397, 58 S.Ct. 630, 82 L.Ed. 917 (1938); United States ex rel. Marcus v. Hess, 317 U.S. 537, 548 et seq., 63 S.Ct. 379, 87 L.Ed. 443 (1943); Murray & Sorenson, Inc. v. United States, 207 F.2d

119, 122, 42 A.L.R.2d 628 (1st Cir. 1953); Anno. 42 A.L.R.2d 634, 636.

 Bankruptcy proceedings are proceedings *in rem*, having for their object, (1) the securing of possession of the insolvent's assets and the equitable division thereof among creditors; and (2) the liberation of worthy debtors from the burden of unpaid debts. The effect of "confirmation" rendered in a bankruptcy "arrangement" proceeding is in no sense punitive in character. Cf. Section 767, Title 11 U.S.C.A. Hence, a discharge in bankruptcy cannot be *res judicata* in a subsequent prosecution of an officer of a bankrupt corporation for transfer of assets to himself of property of the corporation in contemplation of bankruptcy of the corporation. Cf. Rudin v. United States, 254 F.2d 45 (6 Cir. 1958); Douchan v. United States, 136 F.2d 144 (6 Cir. 1943); United States v. Fraidin, 63 F.Supp. 271 (D.C.Md. 1945).

 The prior bankruptcy arrangement proceeding of the John W. Thomas Company cannot be *res judicata* nor can it be an estoppel by judgment to appellant's prosecution on the charges made against him in the case at bar "because the parties plaintiff in the two suits are neither the same nor in privity * * * and the nature of the actions are entirely different." Blodgett v. United States, 161 F.2d 47, 53 (8 Cir. 1947); United States ex rel. Hatfield v. Guay, 11 F. Supp. 806, 810 (D.C.N.H.1935).

Dranow's contention that his prosecution here was barred by *res judicata* or collateral estoppel cannot be legally sustained and the District Court did not err in denying his motion to dismiss his indictment on that ground.

"(b) The Indictment did not charge an offense under Sec. 1341 of Title 18 U.S.C.A."

Under this subtitle appellant asserts one of the general themes recurringly stated in his briefs, namely, that the indictment in the case at bar "alleged a number of purported schemes reaching over a period of nearly five years" which on the face thereof are revealed as "schemes" which if proven "were frauds on the Thomas Company, punishable * * * if at all * * * under State Statutes" and that any "scheme" alleged in the indictment "occurring in 1952, 1954, or 1955" could not be a part of the scheme to defraud in 1957, as charged in Counts One through Ten of the indictment. From that premise he assumes, *arguendo*, that if the pre-1956 conduct of defendant was fraudulent and the defendant was guilty thereof "these 'schemes' were complete in themselves (before 1956) and could not possibly and logically lead to, let alone foreseeably lead to, or encompass a mailing" in the year 1957 of the fraudulent balance sheet dated June 30, 1957.

 A short answer to the above contention is contained in Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954), where it is said:

"The elements of the offense of mail fraud under 18 [U.S.C.A.] (Supp. V) § 1341 are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme. It is not necessary that the scheme contemplate the use of the mails as an essential element. United States v. Young, 232 U.S. 155, [34 S.Ct. 303, 58 L.Ed. 548]."

And by what is stated in Abbott v. United States, 239 F.2d 310, 314 (5 Cir. 1956):

"The statute forbids the *use* of the mails as a means of consummating frauds, and if the mail is used in its actual execution, it matters not whether it was intended or anticipated."

An indictment laid under Section 1341, supra, need not set forth the "scheme" to defraud with such precision as if it were the gist of the offense. Leche v. United States, 118 F.2d 246 (5 Cir. 1941) cert. den. 314 U.S. 617, 62 S.Ct. 73, 86 L.Ed. 496; Cochran v. United States, 41 F.2d 193 (8 Cir. 1930); Cowl v. United

States, 35 F.2d 794 (8 Cir. 1929). All that is required is that the indictment fairly, factually inform the defendant of the character of the scheme as to which evidence will be adduced. Properly conceived and interpreted, the allegations of the indictment here, regarding Dranow's 1952, 1953, 1954 and 1955 fraudulent transactions, established "scienter" for the charge that he willfully caused the June 30, 1957 balance sheet to be sent through the mail, knowing it was fraudulent, for the purpose to defraud. The evidence adduced on the part of the Government revealing the dishonest business Dranow perpetrated prior to 1957 was clearly traced through the books and records of the Thomas Company and was established as being deviously included in the balance sheet of June 30, 1957. That Dranow knew his previous fraud was reflected in that document and that he caused the same to be sent through the mail was substantially proven at his trial. All such proof established the completed crimes as charged in counts One through Ten of the indictment.

■ Therefore, there is no substance to appellant's contention that his indictment alleged matter which reveals a scheme to defraud which, prior to 1956, had been "completed" and that reference to such matter in the indictment was not a part of the scheme or offense charged therein. The District Court committed no error by overruling appellant's motion to dismiss based on the above contention.

"(c) The Court below should have struck the language of the indictment relating to pre-1957 transactions."

The premise of appellant's argument under this subtitle is tantamount to a mere reiteration of that which he makes above, namely, "that the transaction beginning in 1952 through 1956 could not logically or legally be part of a scheme to defraud creditors of the Thomas Company in 1957. His "Motion to Strike as Surplusage" was weighted with the thought that the language of the indict-

ment referring to "a continuing scheme from 1952 to the date of the indictment" was surplusage. For the reasons above stated, it is apparent that there is no merit to this assignment.

■ A motion to strike surplusage from an indictment is addressed to the sound discretion of the District Court and should be granted only where it is clear that the allegations contained therein are not relevant to the charge made or contain inflammatory and prejudicial matter. The motion to strike what appellant claims was "surplusage" in his indictment is without merit. See, United States v. Crummer, 151 F.2d 958 (10 Cir. 1945) cert. den. 327 U.S. 785, 66 S.Ct. 704, 90 L.Ed. 1012.

"(d) The Trial Court should have dismissed the Indictment as prejudicially duplicitous because it alleged several distinct offenses in one count."

■ The proper remedy where allegations of an indictment are unnecessary or prejudicial is not by motion to dismiss the whole indictment or an entire count thereof, but by motion to strike the claimed surplusage. F.R.Cr.P. 7(d), 18 U.S.C.A.; United States v. Hood, 200 F.2d 639 (5 Cir.1953); United States v. Goodman, 285 F.2d 378 (5 Cir. 1960).

From what is said under (b) above, it is apparent that appellant misconceives and misconstrues the indictment's allegations in counts One through Nine thereof. The multiple means by which the scheme to defraud is therein alleged did not subject those counts of the indictment to any claim of duplicity. Cf. Worthington v. United States, 64 F.2d 936 (7 Cir. 1933).

See, also, Owens v. United States, 221 F.2d 351 (5 Cir. 1955).

■ As to counts Ten through Nineteen, the indictment charged that at separate stated times Dranow "while an agent and officer of the John W. Thomas Co., in contemplation of a bankruptcy proceeding by such corporation * * * knowingly * * * transferred *and*

caused to be transferred to" himself a specified sum of money with intent to defeat the bankruptcy law. As to each such count, appellant's counsel seemingly reads therein a charge of "concealment" of assets from a bankruptcy estate, also a crime defined in Section 152, Title 18 U.S.C.A. Laying emphasis on the conjunctive "and" in the phrase, "transferred *and* caused to be transferred" as alleged in such counts, a claim of "duplicity" is asserted as alleging two separate offenses. We shall not follow the technical, strained argument made concerning the latter matter. It is sufficient for us to say that where the conjunctive "and" is used in the charging part of an indictment it does not make the charge duplicitous for stating separate offenses or subject an accused to double jeopardy for the same offense in another prosecution, as appellant perceives. See Bram v. United States, 302 F.2d 58 (8 Cir. 1962); Wolpa v. United States, 86 F.2d 35 (8 Cir. 1936). Furthermore, it does not appear that the indictment in the case at bar was attacked by appellant on such ground before the District Court, hence it is not a matter for review by this Court. Rule 12, F.R.Cr.P., 18 U.S. C.A.

Defendant's claim that each "taking" of some money by defendant at different times, as charged in counts Ten through Eighteen of the indictment, constituted but a single offense, misconceives the "scienter" and impulse constituting the crime therein alleged. The charge is "separate transfers" at different times. Under that charge it was incumbent on the Government to prove that *each time* defendant made a "Transfer" of funds to himself it was made in contemplation of bankruptcy and that he "intended" to and did perform such act knowingly and willfully as charged, i. e. multiple, separate impulses had to be shown. The offense alleged in counts Ten through Nineteen is not "concealment". In the concealment of assets from a trustee in bankruptcy the "scienter" and impulse might be *singular* and

mutual as to all assets which a person charged with the duty to divulge had knowledge of at the time he "concealed" the same from the trustee. That was the situation considered in Edwards v. United States, 265 F.2d 302 (9 Cir. 1959), relied on by appellant.

"The distinction stated by Mr. Wharton is that 'when the impulse is single, but one indictment lies, no matter how long the action may continue. If successive impulses are separately given, even though all unite in swelling a common stream of action separate indictments lie.' * * * 'the test is whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately. * * * If the latter, there can be but one penalty.'" (Wharton's Criminal Law, 11th ed. § 34, quoted with approval in Blockburger v. United States, 284 U.S. 299, 302, 52 S.Ct. 180, 181, 76 L.Ed. 306 (1932).

See, also, Biddle v. Wilmot, 14 F.2d 505 (8 Cir. 1926) ("Bribery").

The same reasoning would apply to the charges made in counts Nineteen, Twenty and Twenty-One of the indictment where separate false entries are alleged to have been made in the books of the Thomas Company on different dates for disconnected purposes in violation of Section 152, Title 18 U.S.C.A. Cf. Bower v. United States, 296 F. 694 (9 Cir. 1924) cert. den. 266 U.S. 601, 45 S.Ct. 90, 69 L.Ed. 462 (false entries made in books of a bank in violation of the Federal Reserve Act, 12 U.S.C.A. § 592.)

"(e) The Court below abused its discretion in denying Defendant's Motion for Severance of the Bankruptcy Counts from the Mail Fraud Counts."

In support of the above contention appellant relies on the case of Beaux Arts Dresses v. United States, 9 F.2d 531 (2 Cir. 1925). All that need be noticed from the cited authority, is that the

Court, in the course of that opinion, recognized a joinder of offenses may be properly made in an indictment where it appears there is a "connection in respect of the time, place, and occasion" and "that it would be difficult, if not impossible, to separate the proofs of one charge from the proofs of the other."

■ Dranow in his argument under "A(a)" infra admits: "The allegations of the first nine counts of the indictment are so clearly identical in language with sub-sections c(2) and particularly with c(3) of Section 32 of Title 11," that "the issues in the arrangement proceeding and the issues in the criminal case were identical" and that "(t)he very issues involved in (his) prosecution of the indictment were the same issues thoroughly litigated in the arrangement proceedings. The facts were the same; the evidence was the same." That being the condition of the record in the case at bar, the District Court correctly denied appellant's motion for severance. Rule 8(a), F.R.Cr.P., 18 U.S.C.A.; United States v. Goodman, supra; Cataneo v. United States, 167 F.2d 820, 823 (4 Cir. 1948).

"(f) The Court below abused its discretion denying Appellant's Motion for Transfer and Continuance."

June 13, 1961, six months after the return of the indictment in the case at bar, Dranow filed a third motion for continuance. At that time he also filed a motion for change of venue under Rule 21(a), F.R.Cr.P., 18 U.S.C.A., to transfer his trial to another district. The premise for this latter motion was that "sensational stories purporting to relate facts pertaining to the various counts alleged in the indictment" had been carried as newspaper items, by radio and TV broadcasts into the homes of prospective veniremen who had been called for service at Dranow's trial, and by reason thereof such prospective veniremen had "formed a prejudice against the defendant to such a degree a fair and impartial trial could not be had" if this case remained for trial in the District of Minnesota. In an affidavit filed by one of counsel for Dranow the "sensational stories" and publicity claimed to be prejudicial to a fair and impartial trial in the District of Minnesota were depicted in essential parts as set forth in the footnotes.[8]

8. As shown by the * * * "AFFIDAVIT OF FRANK J. COLLINS IN SUPPORT OF MOTION TO SEAL AND IMPOUND DOCUMENTS, AND FOR A CONTINUANCE TO PERMIT FAIR AND IMPARTIAL TRIAL, filed with the Court on May 19, 1961 (which Affidavit is reincorporated herein and made a part hereof by reference), Defendant has for a period of years received extensive and adverse publicity, of a widely disseminated kind in the District of Minnesota, connecting him with the Teamsters' investigation and other prejudicial matters unrelated to the issues herein, all despite the fact that Defendant has a perfect record during his life, not even marred by a serious traffic violation.

"This Court ordered the Defendant to appear before the Court on May 31, 1961. Defendant did not appear because his physician refused to permit him to travel. * * *

"On May 31 this Court issued a Bench Warrant for the arrest of Defendant, but ordered an examination to determine

whether and in what manner Defendant could travel.

"As early as May 23, however, on the first news of Defendant's illness, the Minneapolis newspapers began to carry highly prejudicial and inflammatory stories on the Defendant which, from their tenor, indicate that representatives of the prosecution released to the reporters irrelevant and prejudicial information. Thus, for instance, an article in the Minneapolis Star on May 23 said:

'* * * Essling said this would not be the first time Dranow has claimed illness when wanted by the government.

'He said Dranow evaded a senate rackets committee hearing three years ago by claiming illness and that when the committee hearing ended, Dranow disappeared and couldn't be found for 15 months.'

"Either because of Press releases by the prosecution or because of the prosecutors' frequent references in open Court to the McClellan Committee, the newspapers immediately referred to the Defendant as 'Dranow, a friend and busi-

We have set forth below the full contention Dranow made at that time as to publicity which he asserted was prejudicial to his obtaining a fair trial in the District of Minnesota,—because we consider it most significant that he admits in this Court and the record before us confirms: "This motion was withdrawn on June 30, 1961, when the trial court agreed to continue (Dranow's) trial until July 10 and to call a special jury panel."

Thereafter, on July 6, four days before the date so set for trial, Dranow proffer-

ness associate of Teamster Chief James R. Hoffa' * * * (Minneapolis Star, Tuesday, May 23) or as 'a business associate of Teamster Boss James Hoffa' * * * (Minneapolis Star, Friday, May 26.)

"The Minneapolis Star on Wednesday, May 31, incorrectly reported that 'Government heart specialist * * * from Minneapolis * * * (found) no evidence (that) Dranow is suffering from a heart illness.' A Minneapolis doctor, Dr. Arthur Kerkof testified under oath and in haec verba that the Defendant was suffering from coronary disease.

"Throughout the public reports of these events, beginning on May 23, 1961, there are references to a '$500,000 mail fraud trial' and a '$500,000 swindle', all obviously incorrect and prejudicial descriptions of the indictment against the Defendant.

"On June 8 and June 9, 1961, the flood of adverse publicity has culminated in press, radio and television headline articles, pictures, statements and films, employing the same prejudicial statements made theretofore. In addition, reports appeared that the Defendant had been ordered removed to Minneapolis, '* * * after Court testimony that he had tried to bribe two nurses to alter his medical records,' a reference to inconclusive and irrelevant testimony and accusations at a Miami hearing at which the Defendant did and could not appear, and which—according to the Court—involved only 'the question whether or not Mr. Dranow is physically able to make this trip.'

"Without reason or provocation, without relevancy or materiality, a member of the prosecuting staff in this case offered in Miami testimony by two nurses, one of whom testified that Defendant told her he would make it 'worth her while' if she reported that he was 'sweating profusely.'

"The introduction of this irrelevant testimony at a time when it could not be refuted, and at a time when this case was the center of public attention in the District of Minnesota, did—as the prosecution must or should have known—unleash publicity to an extent which, regardless of what had preceded, inflamed the public in this District sufficiently to make it impossible to obtain a fair trial at the present time.

"Your Affiant is informed and believes that a special jury panel has been selected for this trial and believes that it must be presumed that this jury panel is fully aware that it has been called to try the case against Benjamin Dranow.

"Your Affiant believes that on May 23, 1961, a number of the prospective jurors appeared at the Courthouse and that some of these jurors were present in the Courtroom during the hearing held on May 23, 1961 in this case. Your Affiant believes that virtually every member of this panel must be presumed to have seen or heard the films and photographs of the Defendant being unloaded from a train on a stretcher and must have seen the articles and stories which strongly implied that the Defendant was sent to Minneapolis because a Florida Judge believed that he was guilty of bribing a nurse. On Monday, June 12, 1961, the Minneapolis Star newspaper reported to the public of this State:

" 'A Miami Judge allowed his (Dranow's) arrest Thursday when Court testimony indicated he had attempted to bribe two nurses to alter his medical records.'

"On this same day, Affiant observed and heard similar prejudicial material on radio and TV channels in Minnesota.

"Copies of representative newspaper clippings, including front page pictures of the Defendant being unloaded from the train and including the stories hereinbefore referred to, are attached to this Affidavit. It has not been possible in the time available to obtain a complete file of prejudicial newspaper stories which have appeared in the District of Minnesota papers. Affiant is informed and believes that these stories appeared in newspapers elsewhere in the State of Minnesota. It also has not been possible to have a public opinion survey made which Affiant is informed and believes would establish that at least 85% of the prospective jurors have seen the newspaper stories, heard the newscasts and observed TV pictures of the prejudicial nature aforesaid."

ed another motion to transfer, incorporating therein by reference his previous like motion and one additional news item. This latter motion was denied the same day it was filed without formal hearing by the District Court. Seemingly, the reason for such action is that on June 30, 1961, when Dranow's counsel withdrew his previous motion to transfer, an agreed order was entered in the case at bar:

"That no further pre-trial motions shall be made by Defendant in this case except for reduction of bail bond herein."

Dranow's trial commenced on July 10, 1961. Forty-one (41) veniremen who had not previously served as jurors in the District Court at that term of court were summoned. Only fifteen (15) of such venire were residents of Minneapolis, Minnesota. The first two days of trial were consumed by an incisive, meticulous and thorough examination of each venireman called as a juror. More than the forty (40) "questions requested by defendant to be propounded to prospective jurors by the court" were propounded to each prospective juror and each was personally interrogated by the District Judge as to his knowledge of the case, his prejudice and impartiality. Such examination specifically covered reading newspaper articles or listening to radio or TV programs "regarding this defendant, Benjamin Dranow, or this case," discussion concerning any such matters before or since summoned as a juror, whether such publicity was accepted as factual, whether any opinion had been formed, whether anything read, heard or discussed created any feeling of bias or prejudice, or whether any such left them "indifferent and impartial with respect to" the "guilt or innocence" of Dranow. From such examination there is not the slightest indication that any juror empaneled to try the issues in the case at bar was in any manner influenced against Dranow by any newspaper, radio or TV publicity or otherwise. Whether any prospective juror ever read or heard any particular pieces of publicity now

claimed by Dranow to be prejudicial to his fair trial in the District of Minnesota is left in doubt by the record before us. No member of the panel of prospective jurors was challenged by Dranow's counsel for cause because of having heard or read any such publicity by newspaper or heard over radio or TV. Six members of the original panel of forty-one, two of whom resided in Minneapolis, were challenged for cause by Dranow's counsel on grounds other than publicity. Three such challenges for cause, which included the two who resided in Minneapolis, were sustained. No juror challenged for cause by Dranow was sworn to try the issues joined in the case at bar.

Several times during Dranow's trial, when newspaper publicity occurred which defendant's counsel deemed had some prejudicial connotation, a motion for a mistrial was made on that ground. When any such motion was made, Judge Nordbye's suggestion that he would interrogate the jurors individually in chambers as to whether any one of them had read or heard the articles or broadcasts in question or were prejudiced thereby, was rejected by defendant's counsel on the ground that any such interrogation would only give emphasis to the article or item counsel deemed to be prejudicial to a fair trial, and "because some of the jurors may not have read or heard" such matter.

No showing or offer of proof, other than the affidavit set forth in footnote 8, was ever made that any publicity deemed prejudicial by Dranow ever came to the attention of any juror before or during the trial. No formal instruction for inclusion in the trial court's charge was proffered by Dranow that the jury disregarded all publicity by newspaper, radio or TV regarding Dranow before or during the trial, although his counsel several times stated to the Court he would so proffer such an instruction before final arguments.

At the conclusion of the trial and before the jury was discharged, no motion was made by Dranow's counsel that the jury be interrogated concerning any

newspaper, radio or TV publicity of which Dranow now complains.

The record reveals that defendant's counsel's attitude before the District Court concerning publicity was somewhat passive. Seemingly, however, they were content to merely rely upon the motions filed prior to trial and those made for a mistrial, premised on the grounds of unfavorable publicity and leave this matter static in the record. From our examination of the record regarding all such motions claiming prejudice to Dranow's fair trial on the grounds of unfavorable publicity in the press, by radio and TV which appellant's counsel argues at several different places in their briefs, leaves us with an opinion that there was, as Judge Nordbye said, "an oversensitiveness on the part of defendant's counsel as to such matter" and that no grounds for prejudice to defendant's fair trial on that ground is established by the record in the case at bar. Particularly is this so when the record reveals the repeated admonitions given to the jury from the first day and during the course of the trial, that they should refrain from reading any newspaper article concerning the trial or about Dranow and likewise refrain from listening to any radio or TV newscast regarding such matters.

As hereinabove noted, counsel, in the first pre-trial motion to transfer, stated "that the Defendant Dranow has for a period of years received extensive and adverse publicity of a widely disseminated kind in the District of Minnesota." No attempt was ever made to establish the character or content of any such publicity or that the same created any prejudice against Dranow in the District of Minnesota. However, it may be said that if Dranow was a public figure in the District of Minnesota for some time prior to his indictment and trial in the case at bar his indictment normally would be a newsworthy item. His failure to appear in court on the date his case was first set for trial under circumstances which revealed that he voluntarily, without the recommendation of any physician,

entered a hospital in Miami, Florida, under circumstances tinged by "malingering", notwithstanding evidence to the effect that he had for some years been suffering from "angina pectoris"; his arrest on a bench warrant and his attempt to prevent his arrest thereunder and to defeat his return to the District of Minnesota for trial by the filing of a habeas corpus proceeding in the District of Florida, and evidence properly adduced at that hearing that he attempted to bribe a nurse to change hospital records, and other events occurring in connection therewith, were matters that reasonably could be subjects of normal news reporting.

The publicity which defendant charges was most prejudicial to his having a fair trial in the District of Minnesota occurred prior to the filing of the motion to transfer of June 30, 1961, which was thereafter *withdrawn*. Certainly, if the publicity occurring prior thereto had the prejudicial connotation and impact Dranow now places thereon, he and his counsel would not have voluntarily withdrawn that motion to transfer the venue of the case at bar. Seemingly, a continuance of the trial for a period of ten days was all they thought necessary to rectify and dispel the effect of any claim of prejudice in the District Court then made on the ground of unfavorable publicity.

We have culled Dranow's briefs for every statement contained therein, whether factually stated or otherwise, regarding claims of adverse publicity and claims of prejudice against his fair trial in the District of Minnesota. We have examined the entire record before us as to such claims so that we might put ourselves in the same position as that which confronted the District Court when such matter was presented to it. We are not persuaded by the record at Dranow's trial nor by the argument of his counsel now made that there is any sound, logical basis for any claim that the District Court "abused its discretion" denying appellant's "Motion for Transfer and Continuance" or that Dranow "did not have a fair trial." We are definite in our con-

clusion that there is no factual premise here to lead the Supreme Court to a decision such as in Janko v. United States, 366 U.S. 716, 81 S.Ct. 1662, 6 L.Ed.2d 846 (1961) (in which the Solicitor General confessed error) nor such as those considered by the Seventh Circuit Court of Appeals in United States v. Accardo, 298 F.2d 133 (7 Cir. 1962), singularly relied on by Dranow.

What is said in Irvin v. Dowd, 366 U.S. 717, at l. c. 722, 723, 81 S.Ct. 1639, at l. c. 1642, 6 L.Ed.2d 751 (1961) immediately following the Janko opinion, is apposite to the situation here. "It is not required * * * that * * * jurors be totally ignorant of the facts and issues involved" in a case in which they are empaneled and sworn.

> "In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." (Irvin v. Dowd, supra.)

Likewise, that which is said by Mr. Justice Clark in Beck v. Washington, 369 U.S. 541, 557, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), may be paraphrased here: "The fact that petitioner did not challenge for cause any of the jurors so selected" on the ground of prejudice based on alleged unfavorable publicity; rejected the District Court's offer during the trial to interrogate the jury regarding the same; made no request that the jury be polled as to whether they had seen,

read or heard any newspaper item, radio or TV broadcast; and that he was found not guilty on three counts, "is strong evidence that he was convinced the jurors were not biased and had not formed any opinions as to his guilt * * * " when they were empaneled, during the course of his trial or when they came to consider their verdicts in the case at bar. We, like the Supreme Court of the United States, "stands ready to correct violations of constitutional rights * * *." But, in doing that:

> "It is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality." Adams v. United States ex rel. McCann, 317 U.S. 269, 281, 63 S.Ct. 236, 242, 87 L.Ed. 268.

Cf. United States ex rel. Darcy v. Handy, 351 U.S. 454, 462, 76 S.Ct. 965, 100 L.Ed. 1331 (1956). That burden has not been met by Dranow in this case. Beck v. Washington, supra, 369 U.S. l. c. 558, 82 S.Ct. 955; Marshall v. United States, 360 U.S. 310, 312, 313, 79 S.Ct. 1171, 3 L.Ed. 2d 1250 (1958); Delaney v. United States, 199 F.2d 107, 115 (1 Cir. 1952); Finnegan v. United States, 204 F.2d 105, 110 (8 Cir. 1953) cert. den. 346 U.S. 821, 74 S.Ct. 36, 98 L.Ed. 347; Ferrari v. United States, 244 F.2d 132, 137 (9 Cir. 1957); United States v. Howell, 240 F.2d 149, 158 (3 Cir. 1956); Connelly v. United States, 8 Cir., 249 F.2d 576, 584, cert. den. 356 U.S. 921, 78 S.Ct. 700, 2 L.Ed.2d 716; Blumenfield v. United States, 284 F.2d 46 (8 Cir. 1960).

"B. THE EVIDENCE FAILED TO ESTABLISH THE GUILT OF DEFENDANT.

(a) The Trial Court should have directed a verdict of acquittal on all counts of the indictment."

Stripped of all pleonasm the kernel of the argument made in this assignment as it relates to counts One through Nine of the indictment is: "The prosecution

elected to charge a broad scheme commencing February 1952 and continuing through January 13, 1961. (sic) This broad scheme is charged to the defendant and he is alleged to have been responsible for the conduct of all the affairs of the John W. Thomas Company from February 1952 until the mailing of the letters on August 8, 1957 and the telephone call which occurred on August 7, 1957." It is then asserted that since "the prosecution admitted that its evidence did not establish the broad scheme charged in the indictment and contended for a conviction on some other and smaller scheme to defraud"[9] there was "a complete failure of proof" of the indictment allegations and the District Court "erred in not directing a verdict of acquittal" on counts One through Nine thereof.

We think the fallacy inherent in such argument is patent from what is said hereinabove; but in connection with the whole argument made regarding the "scheme" charged in the indictment we think it should be pointed out that under the Government's theory of this case it was not necessary for it to prove that Dranow was in full charge of management of the John W. Thomas Company prior to 1956, or that he had some connection with keeping the books of that Company prior thereto or thereafter, as Dranow argues.

As hereinabove stated, the evidence adduced by the Government was overwhelming that the June 30, 1957 consolidated balance sheet was false and fraudulent. It was that document, along with its covering letter, that Dranow was charged with having caused to be sent through the mails with intent to defraud. No part of the argument made in Dranow's briefs is *contra* to the falsity of the June 30, 1957 balance sheet as established by the Government's proof, with this one exception which in our opinion pointedly establishes the connection between the pre-1957 fraudulent con-

duct of Dranow and the relevant charge to defraud as alleged. The assertion is made that "the list of some $450,000.00 items which were carried as 'current assets'" in the June 30, 1957 balance sheet "were actually carried on the books of the Thomas Company as obligations of that Company's stockholders" in 1957. It is said that when the above-mentioned balance sheet was prepared and sent through the mail "the reason" such items were carried as current assets is clear. "Dranow had a discussion with Mr. Fountain (the store's manager) and Weiher, (assistant controller) and on their advice he (Dranow) assumed responsibility for these accounts." (That is, the Dranow Fur Company, Held, Weinblatt and Peltz notes which Dranow had previously acknowledged were worthless and uncollectible when he bought all the stock of the Thomas Company.) Thus it is said, "when Weiher examined the books and records of the Company this assumption (of fraudulent indebtedness according to the Government's proof) by Dranow was reflected on the books, and as he was sole owner of the Company and all its assets through the ownership of its stock, it is clear why Weiher retained these accounts * * * now the stockholders' accounts," under the caption "Current Assets" and included the same in the June 30, 1957 consolidated balance sheet.

With the above assertion before us, there is a rather simple and ready answer as to why the indictment alleged and the Government's proof in the case at bar was, of necessity, extended back to 1952. If the so-called "broad scheme" had not been alleged in the indictment the Government would have been unduly limited in its proof to establish that the 1957 balance sheet was false as charged. Particularly is this so in the light of Dranow's contention that he, in good faith, had assumed the indebtedness above mentioned as the sole owner of the stock of the John W. Thomas Company. To prove

---

9. We find no such admission or contention made by Counsel for the Government at the page in the record cited, or any other place therein, which supports the above statement.

that such claimed assumption was itself fraudulent and not factually made in good faith as Dranow asserted, the Government undertook the burden to, and did, prove the original transactions were infested with fraud from their beginning and with such background and proof, together with Dranow's financial worth in 1957, the issue was raised as to Dranow's good faith assumption of such indebtedness; and that Dranow's contention that he did was itself fraudulent, which fraud also entered into the scheme to defraud and use of the mails in execution thereof, as charged in the indictment. "A single scheme to defraud may involve a multiplicity of ways and means of action." United States v. Crosby, 294 F.2d 928 (2 Cir. 1961). Whether it does or not is a factual question. The jury's determination of that matter and that Dranow did not in good faith assume such indebtedness is beyond our power to review, unless the testimony which it chose to believe was "incredible as a matter of law." It was not. Bryson v. United States, 238 F.2d 657 (9 Cir. 1956).

We recognize, as appellant here argues, that proof of another crime is not admissible for the purpose of proving the particular crime charged in an indictment. But as here made that argument overlooks the exception to such rule, namely, that where it is incumbent to prove motive, intent, or absence of mistake or accident and to establish a common scheme to defraud, proof of similar related criminal transactions is admissible. Cf. Bracey v. United States, 79 U.S.App.D.C. 23, 142 F.2d 85 (1944) and cases therein cited

We shall not prolong this opinion by any detailed discussion of Dranow's argument that "the evidence adduced in support of the bankruptcy counts was completely inadequate to establish" his guilt. Again, the premise for such assertion is "concealment". What has been said hereinabove establishes each such count of the indictment charged and proof thereof established

separate "transfers" of assets made in violation of the bankruptcy laws.

The District Court did not err in denying Dranow's "Motion for Judgment of Acquittal" made at the close of the evidence.

"(b) The Court at the very least should have granted a new trial."

The motion for "new trial" alleged "fifty grounds" as the basis therefor. Dranow's argument under the above assignment covers two and one-half pages. In his presentation thereof it is said:

"All the other errors * * * alleged supra and infra in this brief were urged on the trial court by this motion. The errors on admission and rejection of testimony, in permitting the injection of prejudicial collateral issues such as forged notes, concealment, embezzlement, preparation of fictitious inventories, falsification of inventories, alterations of records, embezzlement, secreting of funds of the Thomas Company and income tax evasions were charged to appellant but were not involved in any charges in the indictment and testimony thereon was received in evidence to appellant's prejudice. This was urged on the court as error."

Manifestly no reviewable error is submitted to this Court under the above assignment or argument. Because of the generality of the foregoing statement it does not warrant any consideration by this Court. If counsel do not specifically point out error in rulings made by a trial court and are content to present matter to us in such a general fashion, without any reference to the record where such matter may be found so that we might make an independent judgment thereon, we will not perform the duty of counsel and search the record for specific errors. All we shall do in a criminal case is examine the record as a whole to satisfy ourselves that a conviction has not resulted in manifest injustice. Hoyer

v. United States, 223 F.2d 134 (8 Cir. 1955).

The record reveals that the after-trial motions filed by Dranow were submitted to the District Court without argument. Nevertheless, Judge Nordbye filed a written memorandum of record, but did not publish the same, in which he made a general review of Dranow's trial and thereafter specifically considered the "numerous motions for a mistrial"; the reception and rejection of evidence proffered; the sufficiency of the evidence to sustain the verdicts and the "sweeping criticism * * * lodged as to the Court's charge"; the claim of "adverse publicity" and all other matter raised in pre-trial and trial motions. If Judge Nordbye, without full presentation of such motion to him, was indulgent enough to point out to Dranow, without argument having been made regarding the above matter, why he considered Dranow's after-trial motions to be without merit, it is not asking too much of Dranow to at least point out to us with some specificity how and where Judge Nordbye was wrong in denying him a new trial. After review of the record before us we think Judge Nordbye legally ruled Dranow's after-trial motions in such memorandum. Motions for a new trial are addressed to the discretion of the trial judge, which in the absence of abuse is not reviewable here. Firotto v. United States, 124 F.2d 532 (8 Cir. 1942); Pool v. United States, 260 F.2d 57 (9 Cir. 1958).

"(C) THE COURT ERRED IN ADMITTING CERTAIN EVIDENCE."

The first statement made under this assignment is: "The Court below erred when it received in evidence the following prejudicial prosecution exhibits and testimony over the objection of appellant." Typical of errors thereafter asserted is:

"Prosecution Exhibits 23 and 23-A, Business Records of Kirby-Block Co. and yellow sheet letter to Dranow and a white sheet copy of a form.

* * * No proper foundation laid and there was no evidence it was ever received in the mail." (R. 658–659)

On examination of the record at the cited reference we find an objection made by appellant to Ex. 23 as follows:

"The defendant objects to 23, Your Honor, for the same reason and upon the same ground we heretofore objected to the preceding document, namely, it does not appear that it was ever received in the mails."

An examination of other parts of the record reveals that Ex. 23 is typical of the letters dated August 8, 1957 signed by Dranow, in which, among other things, it is stated: "Attached hereto you will find our balance sheet of June 30, 1957." There was positive evidence of the receipt of that letter and balance sheet through the mail by the person to whom it was addressed. As to Exhibit 23(a) the record reveals that appellant's objection thereto was sustained and such exhibit was not received in evidence or exhibited to the jury.

Thereafter, assignment of error is made to sixteen (16) other exhibits, or series of exhibits, to which the claim is made that they were erroneously received in evidence over general objections of "hearsay", * * * "no foundation laid" * * * "incompetent, irrelevant and immaterial." Such exhibits related to a Dun & Bradstreet report; check and vouchers of the Thomas Company, payable to Dranow, some signed by him in January 1958, just prior to bankruptcy of the Thomas Company; financial statements of Dranow and his wife, establishing his claimed wealth on May 24, 1957; ledger sheets and financial statements of Dranow; an application card for credit by Dranow, establishing a claimed relationship to the Thomas Company at a time when Dranow asserted he had no connection with that Company; photographs of Teddy Held and of his handwriting; applications made and correspondence Dranow had with Teamsters Union Pension Fund regard-

ing a $1,000,000.00 loan to the Thomas Company; and Dranow's income tax returns. We have examined each of those exhibits and reviewed the record in relation thereto. We have done so in the light of claims of prejudice here made, because of the admission of such exhibits as evidence for consideration by the jury, even though the claims of error now made in respect thereto are somewhat different than that made by counsel at the trial. We are not impressed by any assertion of Dranow that said exhibits were not material to the issues presented to the jury, or that singly or collectively they were prejudicial. They all relate to Dranow's financial status in 1956 and 1957, or to financial dealings he conducted for the Thomas Company at or near the time he says he assumed liability for the Dranow Fur Company, Held, Weinblatt and Peltz promissory notes. The bank records of Dranow reflected deposits made to his bank account coincidental to the time withdrawals were made in January 1958, just prior to bankruptcy. It is a fundamental rule that objections to the admissibility of evidence must be specific and that general objections such as those advanced here are insufficient, standing alone, to support a claim of error before this court. Cf. Duncan v. United States, 68 F.2d 136 (9 Cir. 1933).

The concluding part of the argument made under the above assignment simply lists one hundred forty (140) Government exhibits claimed to have been erroneously received in evidence, without specifying the character of the exhibit or the objection made thereto. It is impossible, if we are to keep this opinion within proper limits, to make any summary of such exhibits. Primarily, they related to pre-1957 transactions establishing fraud by Dranow which led up to the spurious assets included in the June 30, 1957 balance sheet, which according to the Government's theory of the case, was in proof of the scheme charged in the indictment. Manifestly, such exhibits were properly received in evidence from what is hereinabove said.

We can find no merit to the contention of Dranow that the District Court erred in admitting any such evidence for consideration by the jury.

"(D) THE COURT ERRED IN REFUSING AND IN MODIFYING INSTRUCTIONS REQUESTED BY DEFENDANT, AND HIS CHARGE TO THE JURY WAS INCORRECT, INCONSISTENT, MISLEADING AND PREJUDICIAL."

Here, appellant asserts: At the conclusion of the evidence, and before the court below instructed the jury, appellant submitted sixty-six (66) requests for instructions." The gist of his argument is, "No specific instruction requested by the defendant was given in the form submitted or in substance." * * "Instead, the court below gave its own instructions, and, as given, they did not correctly state the law, but were improper, misleading and prejudicial, particularly when the charge is considered as a whole." It is an axiom in federal practice that instructions need not be given in form and language as requested. Ridenour v. United States, 14 F.2d 888 (3 Cir. 1926).

It is the duty of a trial court to instruct the jury on general principles of law applicable to the facts of a case. It is not required to include in its charge what is not applicable law nor to give instructions or outline all possible factual situations which would establish one's innocence of the crime charged. In the giving of instructions there is necessarily a wide range of discretion vested in the trial judge who must clearly and accurately state the rules of law by which the jury is to be guided in its deliberations. He is not bound to adopt the appellant's theory of the case or effect to be given any particular part of the proof. Cf. Nelson v. United States, 97 U.S.App.D.C. 6, 227 F.2d 21, 53 A.L.R.2d 1206 (1955); Jones v. United States, 251 F.2d 288 (10 Cir. 1958).

The first twenty-one instructions proffered by appellant, in his own language "renewed the various motions

of the defendant made during the trial and at its conclusion for a directed verdict of not guilty on each and every count of the indictment." As to requested Instructions 22 through 66, the contention is made that the District Court erred in refusing to give each such instruction as proffered. And such was the character of the general exceptions taken to the charge of the court at the conclusion thereof, so far as proffered instructions were mentioned in such exceptions.[10] Neither in his argument here nor by the exceptions taken to the charge before the District Court does defendant specifically state what error was committed by that Court's failure to give any specific instruction as proffered by him. To be available on appeal, a claim of error that the District Court failed to give a particular proffered instruction must be preserved by an exception specifically stating how and in what manner error was committed by not giving a particular proffered instruction. Nick v. United States, 122 F.2d 660, 138 A.L.R. 791 (8 Cir. 1941); Johnson v. United States, 291 F.2d 150 (8 Cir. 1961); Rule 30, F.R.Cr.P. 18 U.S.C.A.

> "A party objecting to a failure of the trial court to give instructions requested must state specifically to what he objects and why." Armstrong v. United States, 228 F.2d 764, 768 (8 Cir. 1956).

We have examined defendant's proposed instructions and the charge as given by the Court. We think that so far as any instruction proffered by defendant stated a factual issue for consideration by the jury, the charge of the District Court as given generally outlined the theory of the

Government's case as established by the evidence and the theory defendant attributed to evidence adduced by him in defense. We can find no merit to Dranow's assignment that he was prejudiced by failure of the trial court to give any particular instruction as proffered by him.

The exceptions taken to the charge before the District Court were wholly negative in form, i. e. there was no request made for any additional instructions to clarify any matter contained in any instruction proffered which he now asserts was not included in the District Court's charge. Dranow admits in his briefs before us that "some of defendant's instructions were partly covered." So long as he did not point out to the District Court wherein the charge as given did not cover the substance of any properly proffered instruction, no right of review is here preserved. Isaacs v. United States, 159 U.S. 487, 491, 16 S.Ct. 51, 40 L.Ed. 229 (1895); Derango v. United States, 18 F.2d 778 (6 Cir. 1927); Gausepohl v. United States, 49 F.2d 43 (6 Cir. 1931). Particularly is this so, since the criticism Dranow now makes to the charge is decidedly different from that which he raised by exceptions to the charge in the District Court.

Throughout this part of his argument appellant diverges from his assignment of error and exception taken to the charge, by generally claiming that instructions presented by the prosecution were incorrect, misleading and prejudicial to those instructions which he requested. Again the whole premise for such contention is that the indictment charged and the proof established "dis-

---

10. Exceptions taken at the close of charge by appellant were he "objected to the failure of the court to include requested instructions * * * 22 through 26"; that "where some of the defendant's instructions were partially covered * * * they were inadequately covered and * * * handled * * * as to make the charge confusing, misleading and conflicting."

Thereafter the exceptions relate to inclusion in the charge, instructions as re-

quested by the prosecution, comments on the evidence, * * * length of charge and over-emphasizing the Government's case * * * reading of indictment to jury * * * understatement of defendant's contentions and evidence * * * general criticism of charge as to manner in which the court treated with certain factual matter.

connected and a number of small schemes to defraud" and that "it was error on the part of the District Court to charge in respect to one large scheme," as was the Government's theory of the case. It is asserted Dranow's proffered instruction properly confined the issues to the single crime of mailing and attempting to defraud in 1957 which, he says, was the only crime charged against him in the indictment. We have hereinabove demonstrated the fallacy contained in that theory of defense. In our view, the charge was correct as given. It incorporated the pre-1957 conduct of Dranow and guided the jury to a consideration thereof as to whether Dranow thereby knew that the June 30, 1957 balance sheet was false, considered in connection with the letter he caused to be sent out over his signature on August 7 and 8, 1957, with intent to defraud creditors of the John W. Thomas Company. Certainly the Court was not required to treat such evidence in his charge as Dranow sought to treat with it, namely, that he was not guilty as charged. The instruction of the Court as to his theory of defense was fairly and properly covered.

## "(E) THE COURT ERRED IN REFUSING TO ADMIT EVIDENCE OFFERED BY APPELLANT."

■ Government's Exhibit 38A received in evidence was an exhibit used for comparative purposes to establish before the jury what the financial condition of the John W. Thomas Company was on June 30, 1957, if $441,000.00 of accounts and notes receivable (i. e. the Dranow Fur Company, Held, Weinblatt and Peltz notes) and other asset items were deducted from the June 30, 1957

consolidated balance sheet as assets. We have not set forth in this opinion all the ramifications of the evidence as to that matter. We do not consider it necessary to encumber this opinion therewith because Dranow's defensive contentions concerning those things are, as Judge Nordbye said, "so bereft of any real substance" as to make them, in our opinion, fantastic and outlandish. It is sufficient to say that he sought to shift the wrongful blame for the false balance sheet and the mailing thereof onto the shoulders of the manager, the controller, and other minor employees of the John W. Thomas Company, and declared that he was benumbed of any knowledge of the fraudulent character of such balance sheet.[11]

In an attempt to sustain that position before the jury, Dranow attempted to prove by a reputable C.P.A. that by proper accounting principles there was no theory by which such items could be properly deducted from the balance sheet of June 30, 1957; that the $441,000.00 and other accounts receivable as current assets were properly included therein because Dranow, as owner of all the stock of the John W. Thomas Company, had assumed responsibility therefor and that if the negotiations for "the sale" of certain "real estate" owned by that Company was consummated as Dranow said he anticipated in the covering letter of August 8, 1957, the John W. Thomas Company would have had a financial standing tantamount to that set forth in the balance sheet of June 30, 1957. Certain exhibits reflecting such assumed and non-existing facts situation were proffered along with the testimony of such C.P.A. The District Court's rejection thereof is claimed to be reversible error.

11. It was not necessary for the Government to prove that defendant *personally* wrote the letters, or mailed them, or even knew of each individual and minute act performed by employees of the Thomas Company in connection therewith, or the preparation of the June 30, 1957 balance sheet. There was ample evidence, if the jury chose to believe it as the verdict indicates, that Dranow was the active head of the John W. Thomas Company; that he was the instigator of the scheme to defraud and he was responsible for what was done in connection therewith. Cf. Shreve v. United States, 103 F.2d 796 (9 Cir. 1939).

■ The premise for such claim is that the trial court permitted the Government to put before the jury Exhibit 38A, but rejected the proffered evidence of Dranow's accountant and exhibits prepared by him to reflect Dranow's contention. We shall not follow all the ramifications of that contention. It seems sufficient to merely point out that what was proven by the Government's evidence and Exhibit 38A regarding the above matters was established and premised on proven facts then and previously existing. What Dranow complains of in this assignment is that the District Court erred in rejecting evidence resting on speculation and conjecture and regarding matters "of the Thomas Company (which might have existed) should the plans referred to in (Dranow's) exhibit" be carried into effect. They never were. The only basis for such testimony and exhibits was that Dranow stated in his covering letter he expected to sell some Thomas Company real estate when the fraudulent balance sheet was sent out; and after bankruptcy arrangement proceedings of that Company were confirmed he made a deal for his stock interest in the Thomas Company which he claims took into consideration his assumption of liability for the $441,000.00 of notes receivable. Clearly, Dranow's expectations and the deal he made for his stock in the Thomas Company after bankruptcy, provided no defense to the charge made by the Government that the June 30, 1957 balance sheet was in fact fraudulent when prepared and was known to be so by Dranow when he caused it to be sent through the mail to creditors of the Thomas Company. There was substantial evidence before the jury to establish at that time Dranow was not in a financial position to assume responsibility for the indebtedness due the Thomas Company which he says he assumed. What he received for his depressed stock after bankruptcy provided no basis for its value prior thereto. The only inference from the record is that faked assets in the June 30, 1957 balance sheet in part caused the John W. Thomas Company's bankruptcy proceeding.

We have closely examined the record regarding all matter of evidence proffered by Dranow which it is now claimed was erroneously rejected by the District Court. We can find no error in respect to any ruling made by that Court regarding any such matter. Exclusion of the records of the bankruptcy court proffered to establish Dranow's claim of collateral estoppel, the limitation of defense counsel's cross-examination of the witness Zimmerman, and their limitation in direct examination of defense witness Yallomstein, were not erroneous or prejudicial to Dranow's defense. Defense counsel were given full opportunity, out of the hearing of the jury, to legally demonstrate the nature and relevancy of all such evidence. They were unable to convince Judge Nordbye of the legal competency of such proffered testimony, and we think he was legally correct in rejecting the same.

"(F) A TRIAL FULL OF PREJUDICE * * * BECAUSE OF PROSECUTOR'S CONDUCT AND TRIAL COURT'S UNWARRANTED PARTICIPATION IN THE TRIAL."

■ We reject this assignment in its entirety * * * because we consider it imprudent and scandalous. If it is thought that we should further respond thereto, without giving herald to the scandal we find in this argument it can be said * * * the content of the personal expressions made under the above assignment is devoted to editorializing, seemingly by a mind's-eye, *sans* a factual basis. Here, as at other places in the appellant's briefs where like assertions are made, the subject matter of such comment is left incognito, i. e. we are not cited to any specific pages of the record to support the personal conclusion stated. If counsel are content to leave the subject matter of an editorial statement in their brief incognito, so may we: for if they can point to no more specific blemish than that which they

personally assert, we can only leave them with their enchantment. Absent error specifically pointed to, a court of review has the duty to fall back on the benign and ever-present presumption that a losing party has had a fair and impartial trial; that judgments we are called upon to review are inherently right and the obligation to establish otherwise is a legal burden, self-assumed when an appeal is taken.

■ We have reviewed in detail the voluminous record in the case at bar. We find no error affecting the substantial rights of Dranow. Most of the matter complained of by him relates to procedural matters. The trial of a case such as this normally would be a difficult task for any trial judge. It is most difficult, if not impossible, to conduct such a trial without some degree of error creeping therein. We think that Judge Nordbye, with extreme care, protected every right of Dranow, and any statement *contra* can find no better premise than harmless error.

■ The judge conducting a jury trial in a federal court is more than a "mere moderator"; he is "the governor of the trial for the purpose of assuring its proper conduct." Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321. He has the prerogative, and at times the duty, of eliciting facts he deems necessary to the clear presentation of the issues. To this end he may examine witnesses who testify, so long as he preserves an attitude of impartiality and guards against giving the jury an impression that the court believes the defendant is guilty. United States v. Brandt, 196 F.2d 653, 655 (2 Cir. 1952) and cases there cited.

A full study of the entire record convinces us that Judge Nordbye acted impartially the several times during this trial when he examined a witness, and he did so only to clarify a statement made, or elucidate facts which gave clarity to an exhibit; and that comments made by him in respect to the evidence in his charge were not such as to prejudicially impress the minds of the jury against Dranow. Goldstein v. United States, 63 F.2d 609 (8 Cir. 1933); Stoneking v. United States, 232 F.2d 385 (8 Cir. 1956), cert. den. 352 U.S. 835, 77 S.Ct. 54, 1 L.Ed.2d 54; Schumacher v. United States, 216 F.2d 780 (8 Cir. 1954), cert. den. 348 U.S. 951, 75 S.Ct. 439, 99 L.Ed. 743; Kansas City Star Company v. United States, 240 F.2d 643 (8 Cir. 1957), cert. den. 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438.

"After all, jurors are men with minds of their own, and, where they are given to understand that the responsibility for determining the facts is upon them, they do not generally act against what they believe to be right and just. There is a good illustration of that in this case." Buchanan v. United States, 10 Cir., 15 F.2d 496, 498.

Judge Nordbye submitted all twenty-one counts of the indictment to the jury in identical fashion. The jury acquitted the defendant on three such counts. Those verdicts of not guilty "scatter to the wind" and disperse any conception of jury prejudice to an impartial mind.

In our consideration of this appeal we have not overlooked any proposition proffered by Dranow, whether properly raised or not, whether contained in his "Statement of the Case" or presented for the first time in his reply brief.

Because of new matter raised in Dranow's reply brief, Counsel for the Government seemingly were provoked to seek leave of this Court to file a reply to Dranow's reply brief. Such leave is now denied and the reply brief proffered with such motion for leave is stricken from the record.

Affirmed.